LOREN R. AND MERVIN A. GAJEWSKI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3518–74.   Filed November 10, 1976.

Loren R. Gajewski and Mervin A. Gajewski, pro se.
*James L. Norris,* for the respondent.

HALL, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes, and additions to taxes for fraud, as follows:

|  | Loren R. Gajewski | | Mervin A. Gajewski | |
|---|---|---|---|---|
|  | Deficiency | Sec. 6653(b)[1] | Deficiency | Sec. 6653(b) |
| 1967 | $592.01 | $296.00 | $592.01 | $296.00 |
| 1968 | 2,127.05 | 1,063.52 | 2,127.05 | 1,063.52 |
| 1969 | 2,603.30 | 1,301.65 | 2,603.30 | 1,301.65 |
| 1970 | 2,137.06 | 1,068.53 | 2,137.06 | 1,068.53 |

In the event we do not sustain his determination with respect to fraud, respondent has, in the alternative, determined the following additions to taxes for failure to file (sec. 6651(a)) and negligence (sec. 6653(a)):

|  | Loren R. Gajewski | | Mervin A. Gajewski | |
|---|---|---|---|---|
|  | Sec. 6651(a) | Sec. 6653(a) | Sec. 6651(a) | Sec. 6653(a) |
| 1967 | $148.00 | $29.60 | $148.00 | $29.60 |
| 1968 | 531.76 | 106.35 | 531.76 | 106.35 |
| 1969 | 650.83 | 130.17 | 650.83 | 130.17 |
| 1970 | 534.27 | 106.85 | 534.27 | 106.85 |

The issues for decision are:

(1) Whether the statute of limitations bars assessment of a deficiency for the years 1967, 1968, and 1969;

(2) Whether the statutory gold content of the dollar is relevant for purposes of computing taxable income;

(3) Whether petitioners are entitled to use the accrual method of accounting in computing their net farm income;

(4) Whether respondent's determination of taxable income in the statutory notices is correct;

(5) Whether petitioners are liable for additions to taxes for fraud, or, in the alternative, for additions to tax for negligence and for failure to file returns.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

Petitioners are brothers, and at the time they filed their petition in this case, they resided in Alexander, N. Dak. For

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise specified.

the taxable years 1967 through 1970, each petitioner submitted a Form 1040 "U.S. Individual Income Tax Return" to the District Director of Internal Revenue, Fargo, N. Dak.

Petitioners have been engaged in joint farming operations for a number of years. From 1951 through 1960, these operations were conducted with other members of their family. Since 1961 they have operated a two-man partnership under various names, including Gajewski Farms, Gajewski Enterprises, and Gajewski Bros. For the years 1951 through 1961 neither petitioner filed individual Federal income tax returns, except for the 1959 tax year, when Loren Gajewski (Loren) filed an individual return. On that return Loren reported his distributive share of partnership income and expenses.[2] These items were computed on the inventory method of accounting.

On May 24, 1962, Loren was convicted of making a false statement on his 1959 return. On the same date, he and Mervin Gajewski (Mervin) were both convicted of conspiring with their parents to file false income tax returns for 1951 through 1959.

Subsequent to his indictment on these charges but prior to his conviction, Loren wrote a letter, dated December 19, 1961, to the North Dakota District Director and raised for the first time the issue of whether "dollar" as used in the Internal Revenue Code referred to the standard gold dollar as defined in 31 U.S.C. sec. 314.[3] The District Director replied in a letter dated December 26, 1961, that he had no knowledge with which to answer Loren's request.

While serving prison sentences imposed on their 1962 convictions, Loren and Mervin were interviewed in June 1964 by Special Agent Bauer. The interview was conducted as part of an investigation of their tax liability for the years 1960 through 1963. Neither petitioner had filed returns for any of the taxable years 1960 through 1963. During that interview,

---

[2] During 1959, Loren and Mervin Gajewski and their parents were partners in "Gajewski Farms."

[3] 31 U.S.C. sec. 314 provides:

The dollar of gold nine-tenths fine consisting of the weight determined under the provisions of section 821 of this title shall be the standard unit of value, and all forms of money issued or coined by the United States shall be maintained at a parity of value with this standard, and it shall be the duty of the Secretary of the Treasury to maintain such parity.

both petitioners acknowledged that they had not filed returns for any of the years under investigation. They stated that they were familiar with the Federal income tax filing requirements but had not received $600 in dollars maintained at a parity with the standard gold dollar and consequently were under no obligation to file returns.

In a letter to Special Agent Bauer dated February 6, 1965, Loren reasserted his position that he was under no obligation to file a return. He accused Bauer of attempting to persuade him to perjure himself by filing a return, when Loren in fact knew that he had not received 600 "Dollars" of gross income.

Despite their assertion that they were under no obligation to file returns and despite their distrust of the Government arising from disputes with the Agricultural Stabilization and Conservation Service and from their convictions in 1962, each petitioner submitted purported amended returns for 1962 through 1964 on December 24, 1965. They also submitted purported returns for 1965 on December 31, 1965. All of these documents were similar in that they disclosed only the petitioners' names and addresses and contained the following statement:

> Net income $ *none,* the weight of which are established according to the provisions of 31 U.S.C. 812 [sic] and none in a form of money convertible to such dollars or maintained at a parity of value with such dollars according to the provisions of 31 U.S.C. 314.

The North Dakota District Director rejected each of the documents submitted by petitioners and attempted to return the documents to petitioners on April 27, 1966. However, Loren refused delivery of the documents and accompanying letter sent to him, and Mervin, who had accepted the delivery of his rejected returns, resubmitted the documents to the District Director on May 29, 1966.[4]

---

[4] In a letter accompanying the resubmitted documents, Mervin stated:

"A U. S. Dist. Ct. action forcing you to show cause why you insist on this obvious, pointed and prolonged discrimination may well be in the offing if you do not straighten up and fly right. I am now referring to the manner in which you continue to defeat the law and flagrantly flout the decision of the Tax Court in Docket No. 4930–62 [involving the taxable years 1951 through 1959] by continuing to refuse to clear the record after the judgment of that court has been *fully* complied with by me."

For the taxable year 1966, both petitioners submitted Forms 1040, containing the same information and statement that appeared in the documents submitted for 1962 through 1965. In addition, Loren claimed a Federal gasoline tax refund for nonhighway gasoline used for farming. The District Director rejected both documents as returns, and on February 19, 1970, he returned them to petitioners.

As a result of petitioners' refusal to file complete returns for 1964, the investigation of their tax liabilities for 1960 through 1963 was enlarged sometime in 1965 to include 1964, and thereafter was again enlarged to include 1965 and 1966. Petitioners refused to voluntarily produce any books or records during the audit of their tax liability for these years. In response the auditing agents secured a summons on December 8, 1967. That summons commanded petitioners to appear at a conference scheduled for January 5, 1968, and produce their books and records for the years 1960 through 1966. Petitioners failed to appear at the scheduled conference and failed to produce any of the records requested in the summons. On February 8, 1968, petitions to enforce the summons were filed in the U.S. District Court. On September 30, 1968, the District court ordered petitioners to comply with the summons.[5] This decision was affirmed by the Court of Appeals[6] and the Supreme Court denied certiorari in the case.[7] Nonetheless, petitioners persisted in their refusal to comply with the summons[8] and did not produce the requested books and records until February 20, 1974.

As a result of petitioners' noncooperation and refusal to comply with the summons, the initial determination of petitioners' tax liability for the years 1960 through 1966 was not completed until April 1975. Thereafter, examination reports (30-day letters) for those years were mailed to petitioners on April 7, 1975. In these reports the auditing agent included in petitioners' gross income their distributive shares of partnership farm income. The partnership farm

---

[5] *Gajewski v. Commissioner,* 265 F.Supp. 129 (N.D. 1967).

[6] *United States v. Gajewski,* 419 F.2d 1088 (8th Cir. 1969).

[7] *United States v. Gajewski,* 397 U.S. 1040 (1970).

[8] On June 25, 1970, petitioners wrote Revenue Agent McKay to inform him that "you would be advised to check the statute of limitations which apparently 'ran' while the 'wheels of justice' 'ground' along to a predictable conclusion."

income was computed by using the accrual method of accounting and using cost to value inventory. Subsequently, on September 26, 1975, amended 30-day letters were sent to each petitioner. In them, the partnership farm income was computed on the cash receipts and disbursements method of accounting.

For the years 1967 through 1970, each petitioner submitted a Form 1040 to the North Dakota District Director. These documents were signed by petitioners but contained no information other than their names, addresses, and occupations. Each document included the following statement:

> During the year of 1967 [1968, 1969 and 1970] I received as income no Dollars the weight of which was established according to the provisions of 31 U.S.C. 821[9] and no income in a form of money either convertible thereto or maintained at a parity of value therewith according to the provisions of 31 U.S.C. 314.

In addition, the four documents submitted by Loren claimed a tax credit for nonhighway Federal gasoline tax. In two of these documents Loren claimed an "overpayment" as a result of the tax credit for Federal gasoline tax.

Each of the Forms 1040 submitted by petitioners was rejected as a return by the District Director. The documents were returned to petitioners and in accompanying letters the District Director stated that the documents were incomplete, did not constitute returns, and would not be accepted as returns. The District Director also set forth the filing requirements of sections 6011[10] and 6012[11] and informed

---

[9] 31 U.S.C. sec. 821(b)(2) authorized the President to fix by proclamation the weight of gold and silver dollars. This provision expired under its own terms on June 30, 1943.

[10] Sec. 6011 provided in pertinent part for the taxable years 1967 through 1970:

(a) GENERAL RULE.—When required by regulations prescribed by the Secretary or his delegate any person made liable for any tax imposed by this title, or for the collection thereof, shall make a return or statement according to the forms and regulations prescribed by the Secretary or his delegate. Every person required to make a return or statement shall include therein the information required by such forms or regulations.

[11] Sec. 6012 provided in pertinent part for the taxable years 1967, 1968, and 1969:

(a) GENERAL RULE.—Returns with respect to income taxes under subtitle A shall be made by the following:

(1) Every individual having for the taxable year a gross income of $600 or more (except that any individual who has attained the age of 65 before the close of his taxable year shall be required to make a return only if he has for the taxable year a gross income of $1,200 or more);

Sec. 6012 provided in pertinent part for the taxable year 1970:

petitioners that noncompliance could subject them to prosecution under section 7203.[12] In the letter dated July 20, 1971, which accompanied the rejected Forms 1040 for 1970, the District Director also advised petitioners of the decision of the 10th Circuit Court of Appeals in *United States v. Arthur J. Porth*,[13] wherein the court held that a document containing no information with respect to income and expenses did not constitute a return.

In spite of these warnings, petitioners refused to comply with the District Director's requests that they file complete returns. As a consequence, they were prosecuted for willful failure to file income tax returns for 1967 through 1970, and on January 21, 1974, both were convicted of violation of section 7203. Each was fined and placed on probation subject to the condition that he obey the laws of the United States including the income tax statutes.

During the investigation of their tax liability for the years 1967 through 1970, neither petitioner voluntarily produced any books or records or cooperated with the auditing agents. In addition, they failed to appear at a conference scheduled with auditing agents on October 13, 1971. As a result of their noncooperation, respondent had to resort to third-party information and public records in his determination of their tax liability for the years in issue.

During this period petitioners' primary source of income was from their farming operations. They computed their distributive shares of partnership gross profit derived from

---

(a) GENERAL RULE.—Returns with respect to income taxes under subtitle A shall be made by the following:

(1)(A) Every individual having for the taxable year a gross income of $600 or more, except that a return shall not be required of an individual (other than an individual referred to in section 142(b))—

(i) who is not married (determined by applying section 143(a)) and for the taxable year has a gross income of less than $1,700, * * *

[12] Sec. 7203 provided in pertinent part for the taxable years 1967 through 1970: Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, * * * keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution.

[13] 426 F.2d 519 (10th Cir. 1970), cert. denied 400 U.S. 824 (1970).

farm operations on the inventory method of accounting. Inventory was valued on the cost method, taking into account operating expenses and depreciation. The opening inventory value for 1967 was identical to the closing inventory figure for 1966 which appeared on a summary prepared by petitioners for 1960 through 1966. Similarly the opening inventory value on the 1960 through 1966 summary was identical to the closing inventory figure for 1959 as reflected in petitioners' net worth statement for 1954 through 1959.

Notwithstanding their use of the inventory method of accounting, petitioners failed to maintain adequate books and records of farm income and expenses or inventory levels. The only records they kept were canceled checks, a pocket ledger, a summary sheet of grain inventories, and a depreciation schedule. The pocket ledger recorded food purchases, mileage, and grain sales. For the most part the entries in the ledger are unsupported by receipts or any other documents and the entries reflecting grain sales are illegible. However, we are convinced petitioners' computations of personal expenditures in the ledger are correct.

Moreover, while they conducted physical inventories at the end of each year, the receipts and records which reflect the amounts of grain carried as inventory no longer exist. After the summary sheets were prepared, the more detailed records were destroyed. Aside from the summary sheets, the only records still in existence with respect to the grain inventories are written notations on the granary walls. No evidence as to these notations was produced by petitioners. In addition, no records were maintained on petitioners' livestock inventory. They owned only a few head during the years in issue, but were unsure as to the exact figures.

Petitioners computed their production cost of inventory directly from their canceled checks and their depreciation schedules. They prepared depreciation schedules for each year but did not retain these documents. Instead, they transposed the data reflected on the individual schedules for 1967, 1968, and 1969 onto a single document which was prepared in 1970. This summary included various farm implements, two trucks, and an automobile. Petitioners retained a receipt for the purchase of a chisel plow, but this was the only receipt or record which petitioners retained. No other documentation of

the items carried on the depreciation schedule was presented to this Court.

In addition, petitioners kept no books or records of their current operating costs other than their canceled checks. They computed their operating expenses solely from these checks, their pocket ledger, and their memories. They did not retain any bills or check stubs. The checks were separated into "deductible" and "nondeductible" piles by Loren after they came back from the bank. Those which were segregated into the "deductible" piles were reflected as the current cost component of production cost.

Several of the "deductible" checks were made payable to J. C. Penney and Sears, Roebuck & Co. in payment for work boots or clothes, items which petitioners considered to be deductible. Payments for electricity and heating fuel were categorized as "deductible" by petitioners even though a portion of these payments was attributable to petitioners' house. Moreover, in computing production cost they took into account depreciation and payments for auto parts, gas, and oil, while also including auto expense (at 12 cents per mile) as an element of their production cost. They also included in production cost interest payments of $972 paid to the U. S. Treasury in 1967 on income tax deficiencies for 1951 through 1959, brokerage fees incurred in the buying and selling of silver, legal expenses of $797.51 incurred in 1968 in connection with the perfecting of legal title on a quarter section of land, and legal expenses incurred in connection with the determination of their individual tax liability.

During the years in issue petitioners sold most of the grain they raised to various grain companies. In exchange for this grain petitioners personally received checks in the following aggregate amounts:

| 1967 | 1968 | 1969 | 1970 |
|------|------|------|------|
| $8,219.90 | $17,802.06 | $22,408.89 | $10,308.57 |

They had additional income from the sale of grain to the Fairview Mill Co. in 1969 of $1,618.50 and $1,000. These two payments on the sale of grain were made by check. Both checks were issued in exchange for grain from petitioners' farms, delivered by petitioners to the Fairview Mill Co. The

former check was made payable to Westland Oil Co. at the instructions of one of the petitioners in payment for a truck purchased by them. The latter check was made payable to petitioners' brother Arden at Loren's instruction.[14]

During this period interest income in the following aggregate amounts was credited to petitioners' savings accounts:

| 1967 | 1968 | 1969 | 1970 |
|------|------|------|------|
| $2,690.59 | $2,960.11 | $4,493.76 | $7,288.34 |

Petitioners also received income from other sources in the following aggregate amounts:[15]

| 1967 | 1968 | 1969 | 1970 |
|------|------|------|------|
| $750.67 | $2,145.12 | $991.30 | $7,954.96 |

In addition to their farming enterprises, petitioners operated a farm equipment repair service. The gross sales of this operation were reflected in the sales and use tax returns they filed with the State of North Dakota. The gross sales of this operation were as follows:

| 1967 | 1968 | 1969 | 1970 |
|------|------|------|------|
| $326 | $2,868 | $1,221 | $1,156 |

During this period petitioners' lifestyle was frugal. They obtained most of what they ate by either farming or hunting. As a result their personal living expenses for groceries were as follows:

| 1967 | 1968 | 1969 | 1970 |
|------|------|------|------|
| $400 | $309.23 | $436.57 | $372.51 |

---

[14] The $1,000 was paid to Arden in fulfillment of a request by petitioners' mother. Previously, petitioners' parents had made a loan to the three brothers for the purchase of a farm in 1943. After Arden married and moved away, petitioners owned and operated that farm. The payment was intended to equalize the three brothers' status with respect to the original loan.

[15] These sources included gain from sale of livestock, North Dakota gas tax refund, patronage refunds from grain purchasers, and Agricultural Stabilization & Conservation Service payments.

Their total personal living expenses including, but not limited to, expenditures for food, clothing, utilities, interest, and legal expenses were as follows:

| 1967 | 1968 | 1969 | 1970 |
|------|------|------|------|
| $2,000 | $1,000 | $1,100 | $1,100 |

Respondent mailed petitioners' statutory notices of deficiency for the 4 years here in issue on March 6, 1974. In the notices respondent determined that the petitioners' farm partnership was not entitled to use the inventory method of accounting and computed the partnership's gross income and expenses on the cash method of accounting. Respondent computed the partnership farm business expenses by subtracting from the total checks that cleared petitioners' checking account those checks which transferred moneys to their savings accounts or purchased securities or items determined to be capital expenditures. From this amount respondent further subtracted $2,400 per year as a reasonable allowance for personal living expenses.

## OPINION

### 1. *Statute of Limitations Issue*

Several issues are raised in this case. Initially we are faced with the issue of whether the statute of limitations bars the assessment of a deficiency for 1967, 1968, and 1969. Section 6501(a) provides that "the amount of any tax imposed by [the Internal Revenue Code] shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed * * * and no proceeding in Court without assessment for the collection of such tax shall be begun after the expiration of such period." Whether the statute of limitations bars assessment turns on whether petitioners filed returns for the years in issue.[16] We have found that petitioners filed a timely "Form 1040" with the North Dakota District Director for each of the years 1967

---

[16] If petitioners' Forms 1040 constitute returns for the years in issue then the 3-year statute of limitations would apply unless the returns were fraudulent or unless petitioners omitted from gross income amounts in excess of 25 percent of the gross income stated in the returns. See secs. 6501(c) and 6501(e).

through 1970 and that the notice of deficiency was issued March 6, 1974. Respondent is barred from assessing a deficiency for all but 1970[17] unless the general 3-year statute of limitations is inapplicable to the asserted deficiencies.

Respondent contends that petitioners' convictions under section 7203 for willful failure to file income tax returns for 1967 through 1969 collaterally estops them from asserting that the Forms 1040 filed for each of the years in issue are Federal income tax returns for purposes of starting the running of the statute of limitations. Petitioners assert that the documents were "never adjudicated to be anything other than that which they are on their face, namely 'Income Tax Returns.' " We agree with respondent.

The doctrine of collateral estoppel precludes relitigation of an issue previously determined in a proceeding involving a different tax year or different cause of action. Where a question of fact essential to the prior judgment is actually litigated and determined in the first proceeding, the parties are bound by that determination. *Commissioner v. Sunnen,* 333 U.S. 591 (1948); *John W. Amos,* 43 T.C. 50, 54 (1964), affd. 360 F.2d 358 (4th Cir. 1965). However, where determination of a fact is not essential or necessary to the result in the prior proceeding, the doctrine of collateral estoppel will not bar a subsequent determination in a later proceeding on a different cause of action.

Here, petitioners were convicted on January 21, 1974, under section 7203 for willful failure to file tax returns for 1967 through 1970. Essential to the conviction was the question of whether the Forms 1040 filed for each of the relevant years constituted returns. The conviction thus carried with it a determination that the Forms 1040 did not constitute returns. We therefore hold that petitioners are collaterally estopped from asserting that they filed returns and that section 6501(a) precludes assessment of deficiencies and additions for the years at issue.

Petitioners also assert that respondent "has stipulated an executed 'Form 1040 U.S. Individual Income Tax Return' into

---

[17] Sec. 6501(b) provides that an early return (the 1970 returns were filed Jan. 21, 1971) is deemed filed on the last day prescribed for filing such return (i.e., Apr. 15, 1971).

the Record" for the years 1967 through 1970 and therefore is precluded from denying that the documents are returns. Petitioners seem to have misinterpreted the stipulation. Respondent merely stipulated that the documents were true copies of Forms 1040 signed by each of the petitioners. No agreement existed on whether the documents constituted returns.

## 2. Statutory Gold Content of Dollar Issue

Furthermore, on the merits of the question whether the Forms 1040 filed by petitioners for 1967 through 1969 constituted returns, we find against petitioners. In order for a document to constitute a return, it must contain sufficient data from which the Commissioner can compute and assess the tax liability of a particular taxpayer. *Commissioner v. Lane-Wells Co.*, 321 U.S. 219 (1944); *Edward A. Cupp*, 65 T.C. 68, 79 (1975), on appeal (3d Cir., July 26, 1976).

Petitioners contend that their Forms 1040 adequately disclosed their income in terms of "dollars" as that word is used in 31 U.S.C. sec. 314. They assert although they did file Forms 1040 for the years in issue, they were not required to do so because the symbol ($) means "dollar," and its meaning for purposes of section 6012 is the same as for 31 U.S.C. sec. 314, and they received no such "dollars." In essence, petitioners argue that a dollar is not a dollar because its purchasing power has allegedly declined and because paper currency cannot be converted to gold. They ignore the fact that the enactment of the Gold Reserve Act of 1934[18] marked the abandonment of the gold standard by the United States. That statute made all paper currency and coins legal tender in payment of obligations and prohibited the private ownership of gold.

In *Bates v. United States*, 108 F.2d 407 (7th Cir. 1939), cert. denied 309 U.S. 666 (1940), the taxpayer asserted that he had not realized any taxable gain from a sale of securities in 1935 which he had purchased during the period 1931 to 1933. The taxpayer's claim was based on the change in the statutory gold content of the dollar which occurred between the dates of

---

[18] 48 Stat. 337, 31 U.S.C. secs. 392 and 408(a).

purchase and sale. In rejecting that taxpayer's assertion the court stated at page 408:

> We are of the opinion that judicial decisions and statutory enactments neither recognize, nor, by implication, attach any significance to the statutory gold content of the dollar as a factor in the determination of gain from the sale of capital assets. The standard unit of computation is the money dollar, an abstract or ideal unit of account.[2] This standard unit of money has not changed in money value throughout the existence of our monetary system. There have been changes from time to time in the form of the physical representatives of money, but lawful money in the United States has been the same since the Act of Congress of April 2, 1792, provided that "The money of account of the United States shall be expressed in dollars or units, dimes or tenths, cents or hundredths, and mills or thousandths, a dime being the tenth part of a dollar, a cent the hundredth part of a dollar, a mill the thousandth part of a dollar * * *."[3]

---

[2] "* * * we will notice briefly an argument presented in support of the position that the unit of money value must possess intrinsic value. * * * The coinage acts fix its unit as a dollar; but the gold or silver thing we call a dollar is in no sense a standard of a dollar. It is a representative of it. * * *" Legal Tender Cases, 12 Wall. 457, 552, 553, 20 L.Ed. 287.

[3] C. 16, 1 Stat. 246, 250, Sec. 20, U.S. C.A. Title 31, Sec. 371.

We read *Bates* as holding that for purposes of the tax law, a dollar is what Congress says it is, without regard to intrinsic value or lack thereof. Section 6012 does not incorporate the requirements of 31 U.S.C. sec. 314. If Congress has in fact debased the currency, that is its constitutional prerogative. *Norman v. B. & O. R. Co.*, 294 U.S. 240 (1935); *Nortz v. United States*, 294 U.S. 317 (1935); *Perry v. United States*, 294 U.S. 330 (1935). Without more authority than petitioners have cited to us, we cannot subscribe to their proposition that Congress intended the entire Internal Revenue Code to be rendered illusory by its election to make paper rather than gold tender legal.

Here, petitioners in fact received money of the United States expressed in dollars, and other property possessing a value determined in dollars. Their transactions were made in reference to the currency of the United States, and there is no evidence that they ever refused a tendered payment because the payment was made in United States currency. In light of these facts, we reject petitioners' assertion that they are not required to file returns since they received no dollars maintained at a parity with the standard gold dollar. In so

doing, we hold that the statutory gold content of the dollar is irrelevant for purposes of computing petitioner's taxable income[19] under the Code. As a consequence of this determination, we conclude that the documents filed by petitioners with the District Director do not contain data from which respondent can compute and assess the petitioners' tax liability. They therefore do not constitute returns, and respondent is not barred from determining a deficiency for the years 1967, 1968, and 1969.[20] *Commissioner v. Lane-Wells Co.*, 321 U.S. 219 (1944); *Edward A. Cupp*, 65 T.C. 68 (1975), on appeal (3d Cir., July 26, 1976).

### 3. *Method of Accounting for Income*

Petitioners next contend that "Gajewski Bros." partnership is entitled to use an inventory method of accounting in computing farm income and expenses. Respondent recognizes that his regulations[21] allow a farmer to elect to make returns on an inventory method or on the cash method, but he asserts that petitioners made no election to use the inventory method. Furthermore, respondent asserts that if an election did occur, petitioners are not entitled to use the inventory method because their books and records are inadequate. We agree with respondent.

No evidence was presented on whether the partnership as comprised in 1961 through 1970 filed returns or made an election to use the inventory method of accounting in computing taxable income. We hold that petitioners have

---

[19] See *Edward A. Cupp*, 65 T.C. 68, 80–81 (1975), on appeal (3d Cir., July 26, 1976), and cases cited therein.

[20] Petitioners also assert that they were unaware of this Court's decision in *Edward A. Cupp, supra*, and the decisions in *United States v. Daly*, 481 F.2d 28 (8th Cir. 1973), cert. denied 414 U.S. 1064 (1973), and *United States v. Porth*, 426 F.2d 519 (10th Cir. 1970), cert. denied 400 U.S. 824 (1970), at the time they submitted their Forms 1040. They further argue that, since they were unaware of these cases, the documents they filed constitute returns because they thought that the documents were returns. This contention is without merit. Petitioners' beliefs are relevant only as to the question of intent as it bears on the fraud issue. Moreover, the facts show that the District Director informed petitioners of the decision in *Porth*.

[21] Sec. 1.471–6, Income Tax Regs., provides in part:

(a) A farmer may make his return upon an inventory method instead of the cash receipts and disbursements method. It is optional with the taxpayer which of these methods of accounting is used * * *

failed to prove that they elected to use the inventory method of accounting.

Furthermore, we hold that petitioners are not entitled to use the inventory method because their books and records are inadequate. Historically farmers have had, and still generally have, the option of using the cash method or inventory method of accounting. Sec. 39.22(c)–6(a), Regs. 118; sec. 1.471(a), Income Tax Regs.; see sec. 1.61–4, Income Tax Regs. This is true even though the inventory method may more accurately reflect income and even though other taxpayers who derive income from the production, purchase, or sale of merchandise must use an accrual method of accounting. Sec. 1.471–1, Income Tax Regs.; cf. secs. 1.446–1(a)(4)(i) and 1.446–1(a)(2), Income Tax Regs. The reason for permitting farmers to use the cash method is to relieve them of the burden of maintaining elaborate books and records. See sec. 6073, and sec. 1.6001–1(b), Income Tax Regs. However, where it may be more advantageous for a farmer to use the inventory method of accounting, the bookkeeping burden remains as it does for any other taxpayer who computes his income on a method of accounting which includes inventories. Thus the basic option open to a farmer is to adopt the inventory method and thereby incur the obligation of maintaining systematic and permanent bookkeeping records or to adopt the cash method and keep only such books and records as are necessary to enable the respondent to determine the correct amount of income subject to tax. See secs. 1.6001–1(a) and 1.6001–1(b), Income Tax Regs. If the taxpayer, as here, keeps only such records as permit the respondent to determine his income on a cash method of accounting, he cannot be heard to complain if the respondent so determines his income.

Under their method of accounting as we understand it, petitioners kept inventories of commodities to be sold. However they kept no regular books and records reflecting current operating expenses, depreciation, or inventory levels. The only records they possessed were a pocket ledger, canceled checks, summary sheets of inventories, and summary depreciation schedules. Detailed documents from which the summaries were made were destroyed. Moreover, in computing inventory cost they made no allocation of either direct or

indirect expenses among their various partnership operations; all expenses were allocated to the production of grain.[22] Where no systematic records and bookkeeping practices are employed, use of the accrual method of accounting is not allowed taxpayers who are not required to maintain inventories, and the taxpayer is presumed to be on the cash method of accounting. *James W. England, Jr.,* 34 T.C. 617, 620 (1960); *Mansuss Realty Co.,* 1 T.C. 932, 936 (1943), affd. 143 F.2d 286 (2d Cir. 1944); *John A. Brander,* 3 B.T.A. 231, 235 (1925). Here petitioners, who are farmers, used a method of accounting which employed inventories, but did not maintain adequate books and records. We conclude that in these circumstances respondent properly computed petitioner's distributive share of net farm income on the cash method of accounting.[23]

Petitioners contend that respondent is estopped from computing the partnership income on the cash method for the years 1967 through 1970, because a revenue agent had previously approved petitioners' accrual method of accounting both orally and in a 30-day letter dealing with the years 1960 through 1966.

There is no convincing proof in the record that an oral approval was ever made. In the first 30-day letter for the years 1960 through 1966, mailed to petitioners on April 7, 1975, the partnership income was computed on the accrual method of accounting. Subsequently, on September 26, 1975, an amended 30-day letter was mailed to petitioners on which the partnership income was computed on the cash receipts and disbursements method of accounting. Respondent is not bound by the agreements or preliminary reports of his agents. Such informal agreements are not binding and have no legal effect. *Botany Worsted Mills v. United States,* 278 U.S. 282 (1929). Respondent is not estopped from requiring use of the cash method of accounting.

---

[22] Petitioners raised both grain and livestock and they operated a farm equipment repair service.

[23] *C. E. Clark,* 11 P-H Memo. B.T.A. par. 42,098 (1942). In this case we held that the use of the inventory method by a farmer is conditioned upon the keeping of proper records to reflect inventory values.

### 4. *Computation of Gross Income and Expenses*

The next question we must decide is whether respondent erred in his computation of gross income and expenses. Generally, the gross income of a farmer is the amount of cash and the value of merchandise or other property received during the taxable year from the sale of livestock and produce which he raised. Sec. 1.61–4(a)(1), Income Tax Regs.

Here, petitioners received checks in payment for their grain. They contest only the inclusion of two checks in the gross income of the partnership. The first, in the amount of $1,618.05, was in exchange for grain from petitioners' farm and was made payable to Westland Oil Co. at the instructions of one of the petitioners. The check was for a truck purchased by petitioners from Westland Oil Co. The second check, in the amount of $1,000, was made payable to Arden Gajewski at Loren's instructions. That check was for grain from petitioners' farm. Petitioners assert that the grain belonged to their mother, and that before her death she had instructed them to deliver the proceeds from the sale of the grain to their brother Arden. We do not, however, believe the testimony and have not so found. In light of these facts, we conclude that both checks were gross income to the partnership and respondent properly included them in petitioners' distributive share of net farm income.

Respondent also included interest income in petitioners' gross income. Petitioners contend that since they were not notified by the bank of these payments that these payments were not income. They also contend that inclusion of these items is not proper under the cash method. We disagree; petitioners were in constructive receipt of the interest when it was credited to their accounts by the bank. Sec. 1.451–2(a), Income Tax Regs. Thus, the amounts were properly included in gross income by respondent.

Respondent also included in petitioners' gross income gross sales reflected in their North Dakota sales and use tax returns filed by Loren. Petitioners contend that these amounts do not represent sales but rather purchases that were used by them in their farming operations and for which they paid no sales tax at the time of purchase. However, we found as a fact that petitioners operated a farm equipment repair service during the years in issue. Petitioners have

failed to produce credible evidence to rebut the presumption of the correctness of respondent's determination to that effect. We hold that respondent did not err in including these amounts in gross income.

Petitioners argue alternatively that respondent should have included in gross income only the profit from their blacksmith operation and not gross sales. However, petitioners have presented no evidence with respect to their costs, and therefore have not met their burden of proof that the gross sales figures were not properly included in gross income. Rule 142(a), Tax Court Rules of Practice and Procedure.

Petitioners also assert that respondent erred in computing their farm business expenses. Respondent computed farm business expenses for each year by subtracting the checks which reflected transfers of funds to savings accounts or which were used to purchase securities or items determined to be capital expenditures from the total checks that cleared petitioners' checking account. From this amount respondent subtracted an additional $2,400 for personal living expenses. Petitioners contend that $2,400 was an unreasonably high personal living allowance. We have found that petitioners' lifestyle was frugal in the years at issue. They grew or hunted much of what they ate, spending only about $400 per year for groceries. However, they deducted as business expenses numerous amounts which we found to be personal expenses. These expenses included heating fuel, electricity, and clothing expenses. With some adjustments, we have found that petitioners' computation of personal living expenses maintained by them is correct. We have therefore found the personal expenses as indicated in our findings of fact.

### 5. *Fraud Issue*

The final question before us is whether petitioners are liable for additions to taxes under either section 6653(b), or, in the alternative, sections 6651(a) and 6653(a).

The existence of fraud under section 6653(b) is a question of fact to be determined upon consideration of the entire record. *William G. Stratton,* 54 T.C. 255, 284 (1970). The primary question in determining whether fraud is present is whether there has been an intentional wrongdoing with the specific purpose of evading a tax believed by the taxpayer to be

properly owing. *Mitchell v. Commissioner,* 118 F.2d 308, 310 (5th Cir. 1941). Respondent has the burden of proving by clear and convincing evidence that petitioners are liable for additions to taxes for fraud. Sec. 7454(a). This burden may be met with circumstantial evidence. *Powell v. Granquist,* 252 F.2d 56, 61 (9th Cir. 1958). Such evidence includes conduct calculated to mislead or conceal. *Anson Beaver,* 55 T.C. 85, 92–93 (1970).[24]

Viewing the record as a whole, we conclude that respondent has sustained his burden of proof by clear and convincing evidence for each of the years in question. We have found that, although petitioners were aware of the filing requirements, they failed to file Federal income tax returns for the years in issue, refused to cooperate in any manner in respondent's investigation of their tax liability, failed to keep adequate books and records, and caused purchasers of grain to make payment to third parties.

These factors alone would not necessarily require us to find fraud. However, viewing them in the context of the entire record, it is apparent that behind petitioners' conduct lay a deliberate plan to evade the payment of taxes known to be owing. Petitioners have consistently failed to file Federal income tax returns since 1951. Both petitioners were convicted of conspiring with their parents to file false returns for the years 1951 through 1959, and Loren was convicted of making false statements on his individual tax returns for 1959. Their subsequent failure to file returns for 1960 and 1961 was motivated in part by the fear of future convictions for perjury. Sometime in 1961 they became acquainted with

---

[24] In *First Trust & Savings Bank v. United States,* 206 F.2d 97, 101 (1953), the Eighth Circuit adopted for civil fraud cases the "affirmative action" test of *Spies v. United States,* 317 U.S. 492, 498 (1943). This test requires the willful commission of an act of misrepresentation or concealment and not merely the passive omission of a statutory duty. We have generally followed the approach set forth in *Anson Beaver,* 55 T.C. 85 (1970), and *Powell v. Granquist,* 252 F.2d 56 (9th Cir. 1958), to the effect that fraud may be found where there exists an affirmative indication, rather than affirmative act, that the taxpayer has willfully attempted to evade tax, either by willful failure to file returns or intentional filing of false returns. The facts of this case demonstrate a knowingly defiant attempt to evade the payment of taxes known to be owing, while in *First Trust & Savings Bank* the taxpayer was unaware of his obligation to file returns and pay taxes and fully cooperated with the auditing agents. We think that the facts in this case are sufficiently distinguishable from those in *First Trust & Savings Bank* to allow the finding of fraud here.

31 U.S.C. sec. 314 and included reference to it on the Forms 1040 they submitted for 1962 through 1970. However, these Forms 1040 were determined in a criminal case, and again in this case, not to be "returns." They did not apprise respondent of petitioners' income but instead concealed it.

Viewing their conduct during the years in issue in light of their previous efforts to evade the payment of taxes, it is clear that the actions were part of a plan to conceal the amount and sources of the income and to evade the payment of taxes. It is also clear that they were not going to allow themselves to be "schnookered" again by the Government into leaving themselves open to charges of perjury or conspiracy. Faced with the dilemma of either paying taxes or facing criminal prosecution, petitioners simply failed to submit any Forms 1040 for 1960 through 1964 though they knew of their obligations to file returns and pay taxes. Sometime in 1965 petitioners decided to file Forms 1040 to avoid criminal prosecution for failure to file returns. Subsequently they filed Forms 1040 for the years 1962 through 1965 and each year thereafter. These forms contained no information whatever which would aid the respondent in the computation of their tax liability.

Petitioners, however, assert that their conduct during the years at issue was not intended to effectuate a plan of tax evasion. They contend that they did not possess the specific intent to evade tax, since at the time they submitted returns for the years 1967 through 1970 they were relying upon what they conceived to be the law. Even though they may have been mistaken, they argue this conception alone composed their intent. They further state that they believed that the term "dollar" as used in the Internal Revenue Code meant dollars maintained at a parity with the standard gold dollar. They go on to argue that under their interpretation of the law, for them to compute their tax liability it was necessary to know the parity value of United States coins and currency with that standard gold dollar. As a result of respondent's failure to supply them with this information, petitioners argue they had no choice but to submit returns stating that they had not received any month convertible to gold or maintained at a parity with the gold dollar.

We find no merit in petitioners' contention. It is apparent that this rationale was simply an afterthought. The evidence shows that their plan neither to file returns nor to pay taxes had begun well in advance of the time they initially raised the gold issue. The issue was raised as a mere subterfuge in an unsuccessful attempt to avoid prosecution for willful failure to file returns, and we do not regard it as reflecting the actual intent of petitioners.

In view of the foregoing we hold that respondent has shown by clear and convincing evidence that petitioners are liable for additions to taxes for fraud under section 6653(b) for each of the years in issue. Our holding with respect to fraud under section 6653(b) eliminates the need to consider respondent's alternative position, additions to taxes under sections 6651(a) and 6653(a).

*Decision will be entered under Rule 155.*