HENRY JAMES JOHNSON, JR., a/k/a HENRY LEE JOHNSON, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnson v. Commissioner
Docket No. 3215-75.
United States Tax Court
T.C. Memo 1981-31; 1981 Tax Ct. Memo LEXIS 715; 41 T.C.M. (CCH) 769; T.C.M. (RIA) 81031; January 27, 1981. Henry James Johnson, Jr., pro se. Meno W. Piliaris and Edward P. Phillips, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in and additions to petitioner's Federal income tax in the following amounts for the indicated taxable years: Addition to Tax
Taxable
Sec. 6653(b),
Year
Deficiency
[1] I.R.C. 1954
1970
$ 104,583.34
$ 52,291.67
1971
323,365.57
161,682.79
1972
97,955.98
49,379.75
The only issues raised in petitioner's *716 petition which remain to be decided are: (1) The amount, if any, of petitioner's unreported income from the illegal sale of narcotics, and (2) Whether, if there was an underpayment of tax for any of the taxable years before us, such underpayment was due to fraud. FINDINGS OF FACT Henry James Johnson, Jr., a/k/a Henry Lee Johnson, Jr., (herein petitioner) filed Federal income tax returns jointly with his wife Jacqueline for their taxable years 1970, 1971, and 1972. Inasmuch as petitioner was incarcerated in the United States Penitentiary in Atlanta, Georgia, when the 1972 return was due, he instructed Mrs. Johnson to have a Mr. Lenesome prepare the return using records then at the Johnson home. Such records showed no income from the illegal sale of narcotics or from gambling activities. The return was prepared, and Mrs. Johnson signed it on petitioner's behalf pursuant to a power of attorney given her by petitioner for that purpose. Mrs. Johnson divorced petitioner in May 1976. At the time the petition herein and the amendments thereto were filed, petitioner resided at the United States Penitentiary, Atlanta, Georgia.
Petitioner began sporadically buying and selling narcotics *717 illegally in Charleston, West Virginia, in March of 1971.During that month, petitioner began selling heroin through an individual known as Charles Parker (herein Parker) who was himself a heroin addict. Parker was to sell the drugs, keep one-third of the proceeds, and remit the remaining proceeds to petitioner. The drugs were packaged in quantities that were sold for $ 10 per bag on the street. Petitioner delivered $ 600 worth of heroin (60 bags) to Parker, but two weeks later received only $ 200, Parker having used the rest himself. After this initial episode, petitioner "cut off" Parker and did not use him again as a person through whom he sold drugs. Parker spent most of 1972 in jail. Petitioner did not resurface on the Charleston drug scene until around the first of August 1971. During the 14-week period stretching from August 1 to October 27 of 1971, petitioner sold heroin through, or in partnership with, three individuals: Alphonso Oliver (herein Oliver), Charles Bennett (herein Bennett), and Henry Brooks (herein Brooks). Oliver and Bennett sold hereoin for petitioner under the same arrangement as did Parker--they would keep one-third of the proceeds from the sale of *718 the heroin delivered to them by petitioner and would remit the other two-thirds of such proceeds to petitioner. Brooks did not sell heroin for petitioner but, rather, bought and sold a quantity of heroin for petitioner but, rather, bought and sold a quantity of heroin jointly with petitioner during this period. Petitioner periodically delivered quantities of heroin to Oliver, which were sold at $ 10 per bag. During the relevent 14-week period, Oliver would sell from zero to 35 bags per week, working 4 to 5 days per week. Oliver made $ 1,500 from the sale of heroin during this period; therefore, during this period petitioner received $ 3,000 in gross proceeds from the sale of heroin that petitioner had delivered to Oliver. During the years here in issue, Oliver did not sell illegal narcotics for petitioner at any time other than that time specified above. Bennett sold heroin for petitioner continuously throughout the relevant 14-week period, during which period he averaged $ 900 worth of heroin sales (90 bags) per week. Thus, during the relevant 14-week period Bennett sold $ 12,600 worth of heroin ($ 900 per week x 14 weeks). He retained $ 4,200 and remitted $ 8,400 from *719 such sales to petitioner. Bennett also sold 70 bags of heroin for petitioner at $ 10 per bag during one week in July of 1972. He retained $ 233.33 and remitted $ 466.67 from such sales to petitioner. Bennett did not sell illegal narcotics for petitioner at any times other than those times specified above. In August of 1971, petitioner and Brooks jointly purchased a quantity of heroin from a "Merchant Marine" for $ 3,000, petitioner supplying $ 2,200 and Brooks supplying $ 800. Brooks sold the heroin and, after each party was reimbursed for his share of the initial cost of purchasing the heroin, they split the remaining proceeds of $ 16,200. Thus, petitioner realized an $ 8,100 profit from this joint venture with Brooks. Brooks normally worked for a drug dealer named Donald Gwinn (herein Gwinn) and, therefore, he had no further dealings with petitioner. Other than the heroin purchased from the "Merchant Marine," the heroin distributed to Parker, Oliver, and Bennett in 1971 was obtained in three separate purchase transactions in which petitioner purchased a total of 29 "street quarters" [2] of heroin for a total purchase price of $ 2,645. *720 Petitioner participated in a gambling operation during 1971 from which he realized $ 4,800 profit. On October 27, 1971, the Charleston police conducted a drug raid and arrested several people including Oliver. For several months thereafter, illegal narcotics were hard to come by and were not to be found in Charleston. In 1972, petitioner delivered a quantity of heroin to a Donald Jones (herein Jones) under an arrangement similar to those outlined above. Jones, a drug user himself, had trouble selling the heroin because it was of a poor quality. Petitioner received only $ 500 from Jones along with the return of some of the supposedly unsalable heroin. This returned quantity of heroin was the source of the 70 bags sold for petitioner by Bennett in 1972. The heroin distributed to Jones and Bennett by petitioner was purchased in bulk by petitioner in 1972 for $ 500 (five "street quarters" at $ 100 per quarter). Petitioner was indicted by a grand jury on November 3, 1972. He was charged in Count One with conspiring to distribute heroin from June 1, 1970, to the date of the indictment. Counts Two and Three charged him with traveling in interstate commerce to carry on unlawful *721 activities. Count Four charged that the acts alleged in Count One were part of a continuing criminal enterprise. Petitioner initially pleaded not guilty to all of the counts, and his trial was set for January 3, 1973. However, on that date he pleaded guilty to Counts One and Four of the indictment and the government dismissed Counts Two and Three. He was sentenced on Count One to 15 years' imprisonment and fined $ 25,000. On Count Four he was given an 18-year concurrent sentence and fined $ 100,000. Eighteen months later, that judgment was vacated by the United States Court of Appeals for the Fourth Circuit, which remanded the case for rearraignment. [3]Johnson v. United States, No. 73-2458 (4th Cir., Sept. 3, 1974). Rather than proceed to trial on the original charges, the United States (in October of 1974) obtained a superseding indictment charging petitioner with 41 counts of violating Federal narcotics laws. Counts One, Two, and Three of this latter indictment were identical *722 to the first three counts of the 1972 indictment, and Count Forty-one was the same as Count Fourt of the first indictment. The remaining 37 counts charged petitioner with distributing heroin and traveling in interstate commerce to carry on unlawful activities. Petitioner moved to dismiss the indictment on due process and double jeopardy grounds, but the motion was denied. The government then elected to try him on eight counts only one of which, Count One, was identical to a count in the 1972 indictment. After trial in February 1975, a jury found petitioner guilty on seven counts, including Count One. For the Count One conviction, the court imposed the same punishment petitioner had received when he pleaded guilty to the identical count in the 1972 indictment. The punishment on the remaining six counts together with that on Count One totaled 45 years' imprisonment and $ 200,000 in fines. On appeal, the Fourth Circuit affirmed the conviction with regard to Count One, but reversed the convictions based on the other six counts, holding that petitioner had been denied due process when he was charged in a 41-count indictment following his successful appeal; that, on retrial, petitioner *723 could be charged with all four counts contained in the original indictment; and that it would not deny due process for petitioner to be subjected to a greater sentence should he be convicted on all four counts than was imposed on him at the time he pleaded guilty to two of the four counts in the original indictment. United States v. Johnson,537 F.2d 1170 (4th Cir. 1976). We are unaware of any further trial on these counts. In November of 1972, a Charlestown, West Virginia, grand jury returned an indictment against Gwinn and others charging them with several counts of violating Federal narcotics laws. In the indictment, Bennett and Oliver were named as unindicted co-conspirators. Similarly, in January of 1973, the grand jury returned an indictment against Gwinn and others charging them with several counts of violating Federal narcotics laws. In this indictment, Bennett, Oliver, and Brooks were named as unindicted co-conspirators. In April of 1972, a revenue agent began an examination of the 1970 and 1971 joint income tax returns (and, later, the 1972 joint return) of petitioner and Mrs. Johnson. He attempted to verify the accuracy of the return by utilizing *724 the net worth and expenditures method, which failed to disclose any unreported income which could possibly be attributed to petitioner's illegal sales of narcotics. He found no records relating to the sale of narcotics, and an examination of petitioner's bank accounts failed to disclose funds in large amounts that could have come from narcotics sales. The revenue agent submitted his report covering petitioner's taxable years 1970, 1971, and 1972 in October 1973 after petitioner had pleaded guilty on his January 3, 1973, trial date to being an organizer and dealer in the illegal sale and distribution of narcotics. The report was based on the testimony of witnesses before the Charleston grand jury which was in session in late 1972 and early 1973. The following "Computation of Omitted Income Earned from the Distribution of Narcotics" is the calculation of petitioner's income by the revenue agent upon whch the deficiencies determined in the statutory notice by the Commissioner were based: COMPUTATION OF OMITTED INCOME EARNED FROM THE DISTRIBUTION OF NARCOTICS
Money Turned
Days
Over to Petr.
Pusher
Worked
Each Day
1970
Charles Bennett
182
$ 900
$ 163,800
Charles Bennett
365
900
0
Charles Bennett
182
900
0
Henry Brooks
150
500
0
Henry Brooks
90
500
0
Alfonso Oliver
160
250
0
Charles Parker
60
400
24,000
Charles Parker
270
400
0
$ 187,800
*725 Pusher
1971
1972
Charles Bennett
$ 0
$ 0
Charles Bennett
328,500
0
Charles Bennett
0
163,800
Henry Brooks
75,000
0
Henry Brooks
0
45,000
Alfonso Oliver
40,000
0
Charles Parker
0
Charles Parker
108,000
0
$ 551,500
$ 208,800
Respondent now concedes that Bennett did not work for petitioner until August 1, 1971. He further concedes that Bennett worked for petitioner for only the first three months of 1972 (90 days), as opposed to the first six months. Thus, he asserts gross receipts from unreported illegal narcotics sales of only $ 24,000, $ 360,700, and $ 126,500 for petitioner's taxable years 1970, 1971, and 1972, respectively. He further concedes that petitioner had cost of sales for each taxable year in an amount equal to 21.3 percent of petitioner's gross receipts from narcotics sales, thus conceding $ 5,112, $ 76,829, and $ 26,944.50 downward adjustments of the asserted deficiencies for petitioner's taxable years 1970, 1971, and 1972, respectively. Therefore, respondent now contends that petitioner's deficiencies for his taxable years 1970, 1971, and 1972 are $ 18,888, $ 283,871, and $ 99,555.50, respectively. Petitioner, though *726 admitting the receipt of gross income from the illegal sale of narcotics in 1971 and 1972, contends that he reported such income, albeit without identifying its source, and that he paid the appropriate taxes thereon. He also calculated his cost of the heroin sold according to the prices he allegedly paid for such quantities. He further claims various items as deductions from gross income. He contends that, because of various expenses, his drug operations produced a net loss for 1972.He denies any involvement with narcotics during 1970. On Schedule C of petitioner's 1971 return [Profit (or Loss) from Business or Profession] he reported gross receipts of $ 16,300 and cost of goods sold of $ 232.70 attributable to an unidentified trade or business. From this gross profit of $ 16,067.30 he deducted $ 600 of business deductions, yielding a reported net profit of $ 15,467.30 from this unidentified trade or business in petitioner's taxable year 1971. No such Schedule C was attached to his 1972 return, though he did report a net profit of $ 6,473.61 from the operation of a night club. Petitioner claimed only two dependents on his 1972 return (which claim was not contested by the *727 Commissioner in his statutory notice of deficiency), but at trial claimed a third. He had only two dependents on December 31, 1972. The Commissioner also determined additions to petitioner's tax for the three years here involved under section 6653(b), alleging that all or part of the underpayments determined are due to fraud. Petitioner denies that such underpayments, if any, are due to fraud. OPINION Petitioner is a convicted drug dealer who admits his involvement with illegal narcotics for taxable years 1971 and 1972. The Commissioner has determined deficiencies for petitioner's taxable years 1970, 1971, and 1972 with regard to such activities. The deficiencies for those taxable years were determined relying on estimates of petitioner's gross receipts which were calculated after examining the grand jury testimony of drug pushers and addicts regarding their business dealings with petitioner. The Commissioner further determined fraud penalties for the years involved. Petitioner: (1) denies any involvement with or income from the illegal sale of narcotics in 1970; (2) disputes respondent's calculation of petitioner's drug-related income; (3) contends that he reported *728 his net income from the purchase and sale of narcotics in 1971 (without identifying it as such) on his Federal income tax return for that year; (4) explains that, since by his calculations he sustained a net loss from the purchase and sale of narcotics for his taxable year 1972, his failure to mention such activity was reasonable and correct; and (5) denies that, should we determine that there was an underpayment of taxes for any of the taxable years here before us, such underpayment was due to fraud. To the extent that respondent has neither disavowed his earlier determination [4] nor allowed petitioner an amount for cost of goods sold, [5] petitioner bears the burden of proving the incorrectness of the deficiencies determined by the Commissioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
*729 We would first note that we are extremely skeptical of the validity of respondent's deficiency calculation. He now contends that petitioner received about $ 350,000 of unreported income--yet the revenue agent, when utilizing the net worth method, discovered no appreciable increases in petitioner's net worth during the taxable years before us. Further, the fact that petitioner proceeded prose herein lends little credence to respondent's implications that petitioner is now a rich man. Admittedly, the mere fact that no such hoard was found does not conclusively negate its existence, especially when dealing with a convicted felon. However, the question "where is the money?" has apparently never been answered. The failure to answer such questions has no effect on petitioner's burden of proof, but neither does it bolster our confidence in the correctness of respondent's deficiency determination. The following schedule represents respondent's revised assertions regarding the sources from which petitioner allegedly derived his income from the illegal sale of narcotics: Money Turned
Days
Over to Petr.
Pusher
Worked
Each Day
1970
Charles Bennett
153
$ 900
$ 0
Charles Bennett
90
900
0
Henry Brooks
150
500
0
Henry Brooks
90
500
0
Alphonso Oliver
160
250
0
Charles Parker
60
400
24,000
Charles Parker
270
400
0
Donald Jones
(A transaction in 1972)
0
$ 24,000
*730 Pusher
1971
1972
Charles Bennett
$ 137,700
$ 0
Charles Bennett
0
81,000
Henry Brooks
75,000
0
Henry Brooks
0
45,000
Alphonso Oliver
40,000
0
Charles Parker
0
0
Charles Parker
108,000
0
Donald Jones
0
500
$ 360,700
$ 126,500
The assertion regarding Jones was raised for the first time at trial. Petitioner does not dispute respondent's claim that during 1972 petitioner's dealings with Jones resulted in the payment to petitioner of $ 500 which was obtained from the sale of narcotics provided to Jones by petitioner. Parker apparently testified before the Charleston grand jury which was in session in November of 1972. His testimony led he revenue agent to believe that Parker had dealt drugs for petitioner from October of 1970 to October of 1971. However, Parker was a barely coherent, let alone credible, witness before this Court. Multiple inconsistencies appeared in his testimony. The only thing we are sure of is that Parker is not sure when, where, or how he worked for petitioner. He indirectly acquiesced in petitioner's assertion that Parker only worked for him for two weeks in March of 1971. This business association apparently *731 had yielded only $ 200 to petitioner when, because of Parker's penchant for "shooting up" some of petitioner's potential profit, petitioner cut him off. Petitioner has met his burden of disproving the correctness of respondent's deficiency determination; therefore, we find that petitioner received only $ 200 in gross receipts from his dealings with Parker. Respondent initially contended that Oliver worked for petitioner for 160 days in late 1971. At trial, however, it became apparent that Oliver worked only from around August 1 until October 27 of 1971 (the date of the Charleston drug raid). Several witnesses testified that there were no drugs "on the street" for several months after the raid. However, the parties dispute the amount of heroin profits that petitioner derived through Oliver during this agreed-upon 14-week period. Respondent says that Oliver turned $ 250 per day over to petitioner, but there is no support for that amount in the record. Respondent's own specific requests for findings of fact (as opposed to his general requests) request a finding that "There were one or two weeks when Mr. Oliver sold over 50 bags of heroin." At fifty $ 10 bags per week, petitioner's *732 share of the take would be $ 333.33 perweek, not $ 250 perday. Such illogical inconsistencies in respondent's request for findings of fact make it easy to embrace any logical alternative proven by petitioner. In this case, petitioner adduced testimony by Oliver that Oliver's total take during the 14-week period was $ 1,500. Under the profit-sharing arrangement in effect between petitioner and Oliver, such an amount leads us to the conclusion that petitioner received only $ 3,000 from Oliver during this time. We so find. Bennett's testimony is another example of a witness whose testimony has varied considerably before the various grand juries and during the several criminal trials relevant to this case. It is clear, however, that he also dealt drugs for petitioner during the 14-week period stretching from August 1, 1971, to October 27, 1971, and then ceased his activities because there were no drugs to be had. During that time, Bennett sold approximately $ 900 worth of heroin per week, twothirds of which he turned over to petitioner. Thus, petitioner received $ 8,400 from Bennett's 1971 sales of heroin provided him by petitioner. We are mindful that Bennett's *733 testimony on this subject is contrary to some of his grand jury testimony and, thus, that his veracity is questionable. That assessment can likewise be made about all of the drug pusher/dealers who took the stand in this case. However, respondent called Bennett, Oliver, Parker, and Brooks to the stand, and their testimony beforethisCourt is what we primarily base our findings upon.Therefore, we accept Bennett's latest account of his dealings with petitioner, which account corroborates petitioner's testimony with regard to such dealings, as the best evidence of what actually happened. Bennett also testified that he sold $ 700 worth of heroin for petitioner in mid-1972. We have so found, and we calculate petitioner's share of such sales to equal $ 466.67. The parties sharply dispute the quantum and nature of petitioner's dealings with Brooks. They agree that petitioner and Brooks split $ 16,200 of net profit from their joint transaction with the "Merchant Marine." However, respondent further asserts, and Brooks testified, that Brooks worked as a pusher for petitioner from August 1971 until around the first of April 1972, turning about $ 500 per day over to *734 petitioner. On the other hand, petitioner denied any such continuing involvement with Brooks, claiming that Brooks dealt drugs on his own account and for another dealer, Donald Gwinn. In this instance, we must weigh Brooks' credibility against that of petitioner. Several items of Brooks' testimony lead us to the conclusion that he was trying to convince us, as he has tried to convince various grand jury and petit jury members, that the drugs he sold came from petitioner, when in fact they came from Gwinn. He admitted that he testified before the November 1972 grand jury which indicted Gwinn and petitioner, but asserted on the stand in this trial that he was never asked about Gwinn. We find that very doubtful. Furthermore, he testified before us that petitioner gave him more heroin to sell immediately after the October 27, 1971, drug raid. That statement conflicts with all other accounts regarding the availability of drugs on the street after the raid. Finally, Brooks testified first that he never dealt drugs for Gwinn, then reversed himself a few questions later and admitted to substantial drug-selling activity on behalf of Gwinn. We are convinced that Brooks normally worked *735 for Gwinn but was trying to protect him in both his grand jury testimony and in his testimony before us. Therefore, we find that, other than the short joint venture involving a "Merchant Marine," Brooks never worked for petitioner and that petitioner received no income from illegal drug sales through Brooks. In summary, we have determined that petitioner received, in his dealings with various pushers, the following amounts during 1971 and 1972: Petitioner's Share of
Receipts from Drug Sales
Pusher
1971
1972
Bennett
$ 8,400
$ 466.67
Brooks
8,100
0
Oliver
3,000
0
Parker
200
0
Jones
0
500.00
TOTAL
$ 19,700
$ 966.67
Petitioner introduced evidence that the heroin he purchased in 1971 (excluding the "Merchant Marine" transaction, which we have reflected in the above schedule as a net profit amount) cost him a total of $ 2,645. The heroin purchased in 1972 cost $ 500. Petitioner lists several items as deductible expenses relating to his drug income for the taxable years before us: Expense
1971
1972
Trips to New York to
purchase heroin
$ 465
$ 175
Bail for: Paul Carter
850
0
Oliver
900
0
Petitioner
600
0
Attorney fees
0
2,500
Loss of drugs or
receipts from their sale
807
0
TOTAL EXPENSES CLAIMED AT TRIAL
$ 3,622
$ 2,675
*736 Petitioner failed to substantiate and of these claimed expenses; thus, they are disallowed. Petitioner's net profit from the illegal sale of narcotics for the years before us was as follows: 1970
1971
1972
Gross receipts
0
$ 19,700
$ 966.67
Less: Cost of
goods sold
0
2,645
500.00
Gross Profit
0
$ 17,055
$ 466.67
Less: Deductible
expenses
0
0
0
NET PROFIT
0
$ 17,055
$ 466.67
In addition, petitioner lumped his 1971 gambling earnings of $ 4,800 with his drug earnings, so that the total net profit he should have reported on the Schedule C for the unidentified trade or business, which schedule was attached to his 1971 return, is $ 21,855. The disallowed expenses of $ 3,622 account for the bulk of the $ 6,387.70 difference between the net profit that should have been reported and the net profit of $ 15,467.30 that was reported on the 1971 return. Similarly, our disallowance of his $ 2,675 worth of claimed expenses converts petitioner's presumed loss from 1972 drug operations into a $ 466.67 net profit. Petitioner has failed to show any entitlement to dependency deductions in excess of those allowed by the Commissioner. The Commissioner *737 determined fraud penalties under section 6653(b) [6] for the taxable years before us. The burden is on respondent to prove fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The existence of fraud is a question to be resolved by consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181 (1976). To establish fraud, respondent must show that the taxpayer deliberately intended to evade the payment of taxes by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Respondent herein points to the $ 350,000 of purported unreported drug income as his proof of fraud. Inasmuch as we have determined that petitioner's unreported drug income was, for taxable years 1970, 1971, and 1972, zero, $ 6,387.70, and $ 466.67, respectively, and since such understatements are not due to intentional omissions of income but, rather, are due to a few erroneous deductions, we find that petitioner's underpayments of tax were not due to fraud. Respondent relied almost entirely on his assertion that petitioner failed to report substantial amounts of income over a period of years to *738 prove fraud. No such substantial understatements exist. Respondent has failed to carry his burden of proving fraud. Decision will be enteredunder Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. A "street quarter" of heroin is a quantity which will produce fifty $ 10 bags of heroin.↩
3. The judgment was vacated because of an unspecified violation of the guilty plea requirements of Rule 11 of the Federal Rules of Criminal Procedure↩.
4. Respondent conceded on brief that petitioner derived no income from dealings with Bennett prior to August 1, 1971. ↩
5. For the first time on brief, respondent concedes that petitioner should be allowed an offset for the cost of the heroin he sold and determined that such offset should be calculated by multiplying the gross receipts received by petitioner by 21.3 percent.↩
6. Sec. 6653(b) provides as follows: (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩