CHARLES S. HURSEY and ELLEN HURSEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hursey v. Commissioner
Docket No. 12812-82.
United States Tax Court
T.C. Memo 1987-41; 1987 Tax Ct. Memo LEXIS 41; 52 T.C.M. (CCH) 1456; T.C.M. (RIA) 87041; January 20, 1987. William L. Tankersley, III and Kenneth R. Keller, for the petitioners. Eric B. Jorgensen, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income *43 taxes: Additions to tax
Year
Deficiency
under Sec. 6653(b) [1]
1974
$21,223.19
$10,611.60  1975
9,684.33
4,842.17
1976
3,808.87
1,904.44
In his answer, respondent determined the following increased deficiencies in, and additions to, petitioners' taxes: Additions to tax
Year
Deficiency
under Sec. 6653(b)
1974
$29,980.35
$14,990.18  1975
15,100.80
7,550.40
1976
13,780.97
[2] 6,890.48   The issues for decision are: 1. Whether petitioners had unreported income in the amounts of $64,277.19, $24,251.45, and $31,128.07, for their taxable years 1974, 1975, and 1976, respectively, as determined by respondent's net worth income reconstruction method; 2. Whether part of the underpayment of tax required to be shown on petitioners' Federal individual *44 income tax returns for their taxable years 1974, 1975, and 1976 was due to fraud with the intent to evade tax on the part of petitioner Charles S. Hursey; and, 3. Whether the statute of limitations bars the assessment and collection of the deficiencies in income tax determined by respondent for petitioners' taxable years 1974, 1975, and 1976. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Background
Petitioners Charles S. Hursey and Ellen Hursey, husband and wife, resided in Elon College, North Carolina at the time the petition was filed in this case. For the taxable years 1973, 1974, 1975, and 1976, petitioners filed U.S. Individual Income Tax Returns, Forms 1040, with the Internal Revenue Service Center, Memphis, Tennessee. For the taxable year 1976, petitioners filed an Amended U.S. Individual Income Tax Return, Form 1040X, on August 23, 1977, with the Internal Revenue Service Center, Memphis, Tennessee. Petitioner Charles S. Hursey (hereinafter "petitioner") was born in 1941 and married his present wife, Ellen Hursey, in 1960. The Hurseys have *45 three children. Petitioner is a high school graduate who, since late 1958, has been involved with barbecue restaurants, either working for one of his parents' restaurants or operating his own restaurants. While still in high school, petitioner began working at Hursey's Barbecue No. 2, a barbecue restaurant owned and operated by his father in Burlington, North Carolina. From 1961 to June 1966, petitioner operated a restaurant known as Hursey's Barbecue in Gibsonville, North Carolina. In June 1966, petitioner took over the operation of Hursey's Barbecue No. 2 from his father. Petitioner rented the restaurant's building from his father until he purchased it in August 1976. From June 1966 to September 30, 1976, petitioner owned and operated Hursey's Barbecue No. 2 as a sole proprietorship. During the years in issue, petitioner suffered from a condition known as dyslexia. [3]
In April 1975, petitioner opened Hursey's Barbecue No. 3 in Burlington, North Carolina, and in early 1976 he opened Hursey's Barbecue No. 4 in Glen Raven, North Carolina, and Hursey's *46 Barbecue No. 5 in Mebane, North Carolina. Hursey's Barbecue No. 5 closed in 1977 and Hursey's Barbecue No. 3 closed in June 1983. In 1977, petitioner opened Hursey's Barbecue No. 16 in Durham, North Carolina, which closed in 1978. In 1979, petitioner opened Hursey's Barbecue No. 6, which closed in 1980, and a Dairy Castle, both in Burlington. Petitioner later opened a restaurant known as Charles Hursey Seafood in Burlington, which sold both seafood and barbecue. In April 1975, petitioner hired his brother-in-law, F. Patrick Duncan, to manage and keep records for Hursey's Barbecue No. 3.When Hursey's Barbecue Nos. 4 and 5 opened, Duncan supervised their managers and maintained the restaurants' records while petitioner managed and kept records for Hursey's Barbecue No. 2. Hursey's Barbecue No. 2
During the years in issue, Hursey's Barbecue No. 2 sold retail items such as barbecue, sandwiches, stew, snacks, drinks, and cigarettes. Hursey's Barbecue No. 2 also sold wholesale barbecue to other restaurants. During these years, Hursey's Barbecue No. 2 was primarily a take-out restaurant in that it had no tables at which its customers could eat. Petitioner usually opened and *47 closed the restaurant. The restaurant was open from 1:00 p.m. to 7:00 p.m. on Sundays, from 7:30 a.m. to 7:00 p.m. Tuesday through Thursday, and from 7:30 a.m. to 8:00 p.m. on Friday and Saturday. Petitioner maintained an office in the front of Hursey's Barbecue No. 2, which he usually kept locked. Petitioner kept the restaurant's checkbook and an adding machine in the office. The barbecue sold at Hursey's Barbecue Nos. 3, 4, and 5 was prepared at Hursey's Barbecue No. 2 and sold to those three restaurants. Petitioner, as manager, handled most of the wholesale barbecue sales. Either petitioner, an assistant manager, or a counterman handled the retail sales for the restaurant's walk-in customers and rang these sales up on a cash register. The wholesale sales were not rung up on the cash register, but were recorded in wholesale books so as to maintain separate records of retail sales for sales tax purposes. Petitioner considered his main responsibility in the business to be cooking the barbecue, chopping it up, and mixing in the sauces. When petitioner waited on customers, he would usually take their order, tell an employee in the back room to get the order, add up the dollar *48 amount of the order in his head, and then ring it up on the cash register. The prices on the menu did not include sales tax and required the use of a sales tax chart. The price of a pound of barbecue did include sales tax. Petitioner maintained a clipboard on a wall in Hursey's Barbecue No. 2 for bills received from vendors. At the end of each day, petitioner took the paid bills into his office. Petitioner usually paid the larger bills by check once a month and the smaller bills with cash from the cash register for which he placed a receipt in the cash register. Petitioner, at end of each month, gave the paid bills to his bookkeeper. Wholesale at No. 2
Petitioner handled most of the wholesale barbecue sales for Hursey's Barbecue No. 2, including receiving and delivering most of the wholesale orders. Petitioner maintained an appointment book in which he recorded wholesale orders received by telephone. Petitioner kept wholesale books near the cash register in which he would write up the wholesale order. When the order was written up in the wholesale book, an original ticket and a carbon ticket were made. The original ticket was given to the customer and the carbon ticket *49 was either placed in the bottom of the cash register with the money or left in the book. The wholesale tickets reflected the pounds of barbecue bought and the total dollar amount of the sale. Some of the wholesale customers charged the amount of barbecue that they bought. During the years in issue, petitioner sometimes failed to make any records, including wholesale tickets, of wholesale sales at Hursey's Barbecue No. 2. This was likely to occur when a customer came in with a wholesale order and petitioner's hands were greasy. At the end of the month, petitioner would try to remember the number of pounds of wholesale he had sold during the month. Petitioner has not retained any of the records of the wholesale sales of Hursey's Barbecue No. 2 for the taxable years 1974, 1975, and 1976. He does not remember when he threw away these records. During the years in issue, Hursey's Barbecue No. 2 sold wholesale barbecue to other restaurants and to church groups, social organizations, and large parties. Cash Sales at No. 2
For the years in issue when petitioner closed Hursey's Barbecue No. 2., he would usually take the money out of the cash register, clear the cash register *50 and read the cash register counter. At some point, he would write down a figure on the daily cash sales sheets provided by his accountant. He kept these sheets in a filing cabinet in his office. Petitioner did not take the time to count the money before leaving because the restaurant was in a high crime area of Burlington and it was petitioner's policy that he and the employees leave as a group at night. None of the employees who observed petitioner taking the money out of the cash register and reading the register when he closed the restaurant, ever saw him make any entries on the daily cash sales sheets, or recall having seen the daily cash sales sheets at Hursey's Barbecue No. 2. Some employees, however, saw petitioner mark on the cash register tape or tear the tape off and take it home with the money from the cash register. Petitioner instructed several of the assistant managers to clear the cash register and mark on the cash register tape if he was not there when they closed the restaurant. Petitioner usually knew the approximately volume of his retail sales during a given day. At some point, petitioner would record on the daily cash sales sheets a figure for his weekly *51 wholesale sales of barbecue. Cash Register at No. 2l From January 1973 to June 3, 1975, petitioner used a Model 100 NCR mechanical cash register at Hursey's Barbecue No. 2. When petitioner noticed that the cash register was not functioning properly, he would either try to fix it himself or call a repairman. The cash register had an internal counter and an internal tape on which the sales that were rung up were accumulated and recorded. When the register was cleared, it would print on the internal tape the total sales on the internal counter. If a paper tape was not in the cash register, petitioner would put a piece of paper in the register upon which the cleared total would be printed. Sometime in April or May of 1975, petitioner took the cash register to Bill Wyrick for repair. Wyrick worked for M & W Business Equipment Company performing service and repair of business equipment, including the service and repair of cash registers. The cash register was covered with cooking grease and Wyrick found that the parts were not moving freely. Wyrick chemically cleaned the cash register in order to bring its parts back to a free moving condition. After cleaning the parts, *52 however, Wyrick found that the mechanism was too worn for him to be able to guarantee any repairs and he returned the cash register to petitioner without charge. On May 7, 1975, petitioner purchased a Model No. 21 NCR electrical cash register from M & W Business Equipment Company, which petitioner shortly thereafter used to replace the Model 100 NCR cash register. Petitioner continued to use only the Model No. 21 NCR cash register through December 1977 at Hursey's Barbecue No. 2. With the parts worn and not moving freely in the Model 100 NCR cash register, the internal counter might move less than it should and thereby understate total sales. After the purchase of the new cash register, petitioner moved the old Model 100 NCR cash register to Hursey's Barbecue No. 3. Ingram's Bookkeeping
In June of 1966, when petitioner took over the operations of Hursey's Barbecue No. 2 from his father, petitioner continued to use the bookkeeping and tax preparation service of Roger P. Ingram, Sr. Petitioner's father had been a client of Ingram since about 1956 or 1957. During 1973, 1974, and 1975, petitioner paid $28 per month to Ingram's bookkeeping service to perform bookkeeping services *53 for Hursey's Barbecue No. 2, and during 1975, an additional $28 per month to perform bookkeeping services for Hursey's Barbecue No. 3. These services included preparation of monthly North Carolina Sales and Use Tax Reports; Employer's Quarterly Federal Employment Tax Returns, Forms 941; Employer's Annual Federal Unemployment Tax Returns, Forms 940; and petitioner's State and Federal individual income tax returns. Ingram's bookkeeping service also prepared a monthly summary of expenditures and receipts for Hursey's Barbecue No. 2 for the years 1973, 1974, and 1975, based on information furnished by petitioner, and for Hursey's Barbecue No. 3 for the period from April 1975 through December 1975, based on information furnished by Duncan. Ingram's service also offered a pickup of his client's books and records and return delivery of the records, completed books and various tax returns. If Ingram's clients had a cash register with an internal tape, they usually furnished him with the cash register tape. For his clients that did not have a cash register or whose cash register did not have a tape, Ingram prepared a daily cash sales sheet on which the client could list his receipts on *54 a daily basis and his payroll on a weekly basis, including the employee's name, gross pay, withheld FICA and Federal and State income taxes and net pay. The daily cash sales sheet also provided space for noting other income, the amount of any merchandise taken home for personal use, and remarks. Because Ingram did not believe that petitioner's old mechanical cash register had a tape, Ingram permitted petitioner to use the daily cash sales sheets to reflect his retail and wholesale sales for each week. For the years 1973, 1974, and 1975, petitioner supplied Ingram's service, at the end of each month, with a bag containing cancelled checks, paid bills or paid invoices, and the daily cash sales sheets. Petitioner furnished Ingram's service, on a quarterly basis, with payroll summary sheets on which petitioner recorded by week for each employee of Hursey's Barbecue No. 2, their gross wages, withheld FICA taxes, Federal and State withholding taxes and take-home pay. Ingram's son, Roger Ingram, Jr., would go to Hursey's Barbecue No. 2 to pick up the monthly records, usually within 5 to 8 days after the end of the month. A large percentage of the time, the records were not ready to *55 be picked up or the daily cash sales sheets were missing. For their taxable years 1972, 1973, 1974, and 1975, petitioners' Federal individual income tax returns were prepared by Ingram, with the assistance of one of his bookkeepers. In preparing petitioners' Federal individual income tax returns, Ingram would use the monthly ledgers prepared by his bookkeepers for Hursey's Barbecue No. 2 and tax return information furnished by petitioner. Ingram would contact petitioner if additional information was needed and would review the return with petitioner after it was prepared. At the end of each of the years 1972, 1973, and 1974, Ingram increased the wholesale sales of Hursey's Barbecue No. 2 by $13,000 and included this increase on petitioners' Federal individual income tax return. This adjustment to wholesale sales was made to take account of a draw or salary of $250 per week taken by petitioner from the wholesale sales of Hursey's Barbecue No. 2. At the end of 1972, Ingram made an additional increase in the wholesale sales of Hursey's Barbecue No. 2 of $10,500. At the time of trial, Ingram was unable to remember or identify the reason for this adjustment. In April of 1975, petitioner *56 was drawing $500 per week from Hursey's Barbecue No. 2. In preparing petitioners' Federal individual income tax return for their taxable year 1975, however, Ingram did not make an adjustment to wholesale sales to reflect petitioner's draw. During the years in issue, petitioner always took his draw in cash. Duncan's Bookkeeping
During the time that Duncan was working for petitioner, he was paid a salary plus a commission based on the operating profits of the barbecue restaurants he was managing. Duncan prepared operating statements for these restaurants but, in 1975, his statements did not agree with similar statements prepared by Ingram for the same period. Duncan pointed this out to petitioner, but petitioner was unable to understand the reasons for the differences. Petitioner told Duncan to ignore Ingram's figures and that they would base the commission on Duncan's calculations of profit. When petitioner received the 1975 individual income tax return prepared by Ingram, he asked Duncan to review it for accuracy as to the operating results of Hursey's Barbecue No. 3.After reviewing the return, Duncan believed that Ingram had overstated the profit for Hursey's Barbecue *57 No. 3 by approximately $10,000. In response to this, petitioner took the return back to Ingram. Ingram explained that any overstatement of the profits of Hursey's Barbecue No. 3 would be due to sales from Hursey's Barbecue No. 2 to Hursey's Barbecue No. 3, and would be offset by a corresponding understatement of the profits of Hursey's Barbecue No. 2. In January 1976, petitioner asked Duncan to take over all the record keeping for Hursey's Barbecue No. 2 and No. 3. After petitioner opened Hursey's Barbecue No. 4 and No. 5, Duncan also attempted to maintain the accounting records for these locations. From January 1976 through September 1976, Duncan prepared monthly North Carolina Sales and Use Tax Reports, Employer's Quarterly Federal Employment Tax Returns, Forms 941, and monthly profit and loss statements for Hursey's Barbecue Nos. 2, 3, and 4 and, starting in April 1976, for Hursey's Barbecue No. 5. Duncan eventually found that he was not able to manage Hursey's Barbecue No. 3, supervise the managers of Hursey's Barbecue No. 4 and No. 5, and also have time to maintain the books and records for all the locations. Sharpe's Bookkeeping and Hursey's Barbecue, Inc.
In mid-1976, *58 petitioner contacted Patsy T. Sharpe, who owned and operated an accounting business in Burlington, regarding bookkeeping and 1976 Federal tax preparation services for his barbecue restaurants. Sharpe suggested that petitioner form a corporation to own and operate his barbecue restaurants. On or about September 10, 1976, petitioner formed a corporation known as Hursey's Barbecue, Inc., which began operating Hursey's Barbecue Nos. 2, 3, 4, and 5 on October 1, 1976. Petitioner owns all the stock of this corporation. Sharpe maintained the books and records of the corporation, commencing January 1, 1977, and prepared its U.S. Small Business Corporation Income Tax Return for its taxable year ended May 31, 1977. Sharpe also prepared petitioners' Federal individual income tax return for the taxable year 1976, and petitioners' amended Federal individual income tax return for the taxable year 1976. In preparing petitioners' Federal individual income tax return for the taxable year 1976, Sharpe used the monthly profit and loss statements prepared by Duncan for the period from January 1976 through September 1976. Sales and Deposits
The deposits reflected on the bank account statements *59 for Hursey's Barbecue No. 2 for the years 1974, 1975, and 1976, prior to incorporation, exceeded the sales recorded on the monthly summaries for Hursey's Barbecue No. 2 for each such period. For the periods in issue prior to incorporation, however, the deposits reflected on the bank statements for Hursey's Barbecue Nos. 3, 4 and 5 were less than the sales recorded on their monthly summaries. The sales and deposits for each restaurant were as follows: Difference: Bank
Deposits Per
Sales Per
Deposits Over
Year
Restaurant
Bank Statement
Summaries
(Under) Sales
1974
No. 2
$169,700.94
$133,086.80
$36,614.14 1975
No. 2
205,787.63
192,537.05
13,250.58 1976 *
No. 2
174,530.73
143,799.68
30,731.05 1975 **
No. 3
157,556.44
158,906.35
(1,349.91)
1976
No. 3
140,485.53
148,996.99
(8,511.46)
1976
No. 4
73,473.86
90,860.26
(17,386.40)
1976 ***
No. 5
40,345.85
43,604.26
(3,258.41)
*60 Sources of Income
Other than approximately $10,000 to $15,000 of interest income each year on certificates of deposit and savings accounts, which interest was usually not withdrawn, petitioner's only major source of income was from his barbecue restaurants. During the years in issue, petitioners deposited cash from Hursey's Barbecue No. 2 into their personal bank accounts. Most of the deposits made by petitioners to their personal checking account and personal savings account during the years 1974 and 1975 were in cash, not checks. During the year 1974, petitioners deposited $25,655 in cash and $9,598.26 in checks into their savings account at Wachovia Bank and Trust Company. During the year 1975, petitioners deposited $6,977 in cash and $416 in checks to the same savings account. State Fair Sales
In October of 1976, petitioner sold 2,545 pounds of barbecue, 1,420 pounds of brunswick stew, and 50 pounds of cole slaw to Troy Barber for a total price of $5,096.50. Barber purchased these items for resale at the North Carolina State Fair. The records that petitioner furnished to Duncan for October of 1976, however, reflect that his wholesale sales of barbecue for the *61 month, other than sales to his other restaurants, totalled $3,230. This amount is indicated as including his regular wholesale sales, a sale to a party, and his sale for the State Fair. In October of 1975, petitioner sold barbecue and brunswick stew to Barber for resale at the North Carolina State Fair in amounts slightly less than what he sold to Barber in October of 1976. The monthly summary for October of 1975 prepared by Ingram for Hursey's Barbeque No. 2 reflects wholesales sales of barbecue for the month, other than sales to Hursey's Barbecue No. 3, totalling only 380 pounds. None of these records reflect any wholesale sales of brunswick stew or cole slaw. Circle 5 Ranch
In October 1972, petitioners acquired a farm from Mable Barber which they later named the Circle 5 Ranch. During the taxable years 1973, 1974, 1975, and 1976, petitioners paid $7,500 per year to Barber as part of the purchase price of the farm. During the taxable years 1974, 1975, and 1976, petitioners raised hogs on the farm. The hog raising operation was terminated in 1976. The Circle 5 Ranch was assigned a tobacco allotment which enabled petitioner to grow and sell a specified number of pounds *62 of flue-cured tobacco as allowed by the Agricultural Stabilization and Conservation Service of the U.S. Department of Agriculture. The farm's tobacco allotments for the years 1974 to 1979, inclusive, were 6,501 pounds, 7,470 pounds, 6,352 pounds, 5,588 pounds, 5,588 pounds, and 5,479 pounds, respectively. There was a tobacco allotment for the year 1973, but the amount of the allotment is unknown. Petitioners leased their tobacco allotment for each of the years 1973 to 1979 to James Cobb. Cobb paid petitioners between 10 cents and 25 cents a pound for the allotment during each of the years. Petitioners reported on their Federal joint individual income tax returns for their taxable years 1973 and 1979, $690 and $1,369.75, respectively, as income from the rental of tobacco allotments. On November 21, 1973, petitioners received a payment from Cobb in the amount of $720 for the rental of their 1974 tobacco allotment. Petitioners did not report any income from the rental of their tobacco allotments on their Federal joint income tax returns for their taxable years 1974 through 1978. Children's Accounts
For the taxable years 1973, 1974, and 1975, petitioner furnished Ingram with *63 Forms 1099 reflecting interest earned on savings accounts in his children's names. Each of the accounts listed petitioner as trustee for one of his children. Because the interest income on these accounts was reported on Forms 1099 bearing petitioner's Social Security number, Ingram reported the interest on petitioners' Federal individual income tax returns. During the years 1974, 1975, and 1976, the interest earned on these accounts totalled $1,925.45, $2,158.94, and $2,321.60, respectively. Petitioner made neither deposits to nor withdrawals from these accounts during the years in issue, other than to shift money between accounts in the same child's name. 1973 Audit
Petitioners' Federal individual income tax return for the taxable year 1973 was audited by Anna Jackson, a tax auditor of respondent. Jackson first contacted petitioner in January of 1975 and began the examination in February of 1975. Jackson requested the books and records of petitioner's barbecue business which were provided by Ingram. She also asked petitioner for additional information, including loans, bank and savings account balances, gifts, and other non-taxable sources of income. This information *64 was promptly provided by petitioner. Jackson reconstructed petitioners' taxable income for the taxable year 1973 by the source and application of funds income reconstruction method. Her reconstruction of petitioners' taxable income determined that petitioners had underreported their gross income for their taxable year 1973 in the amount of $19,656.72. On April 1, 1975, Jackson mailed to petitioners her Report of Individual Income Tax Audit Changes, an explanation of adjustments, and her source and application of funds statement, for the taxable year 1973. Her report reflected a deficiency in tax for the taxable year 1973, in the amount of $4,827.83, and an addition to tax pursuant to section 6653(a) of $241.39. The letter sent with the report offered petitioners the opportunity to present additional evidence or to request a conference with the examiner or the District Conference Staff if they did not agree with Jackson's determination. Petitioners were requested to sign the consent to assessment and collection at the bottom of the report and return it to Jackson if they agreed with the determination. Jackson never discussed her findings or method of calculating the alleged *65 understatement with petitioners. When petitioner received the audit report from Jackson, he took it to Ingram for review. Ingram explained to petitioner the source and application of funds income reconstruction method and told him that if he could not find loans or withdrawals from savings accounts to explain the understatement, he should pay the deficiency. As advised by Ingram, petitioner signed the report and forwarded it with payment to Jackson on April 11, 1975. Petitioner told his brother-in-law, Duncan, that his 1973 return had been audited and that Ingram had made a mistake in preparing the return with regard to interest on certificates of deposit. [4]
Durham's Examination
In March of 1978, Revenue Agent Larry Durham contacted petitioner regarding an examination of petitioners' Federal individual income tax return for their taxable year 1976. Petitioner told Durham that Sharpe had prepared the 1976 return and that she would be familiar with information which Durham requested. Durham contacted Sharpe and arranged to conduct the audit in her office on March 3, 1978. *66 After receiving Durham's call, petitioner contacted Sharpe and requested that she provide Durham any information he requested. When Durham arrived at Sharpe's office on March 3, 1978, she furnished him with access to the books and records she had prepared for petitioner, a summary sheet listing her activities regarding the 1976 tax return, and other various information about her bookkeeping functions and petitioner's farm operations. Petitioner was not present at this meeting. On March 7, 1978, Durham had an initial interview with petitioner at Sharpe's office. Sharpe was present during this interview.Durham asked petitioner questions regarding prior audits, and petitioner informed Durham that he had been audited for the year 1973 and had to pay additional taxes for the year 1973. At this stage of the audit, petitioner was very cooperative with Durham and provided Durham all requested business and personal records. Petitioner also arranged for Durham to be able to interview Duncan and for Duncan to provide Durham with additional records. For the taxable year 1976, Durham was given: bank statements and cancelled checks for petitioners' personal and farm checking accounts; records *67 of savings accounts and certificates of deposit; Forms 1099; bank statements, cancelled checks, paid invoices, and Duncan's profit and loss statements for Hursey's Barbecue Nos. 2, 3, 4, and 5; daily cash sales sheets for Hursey's Barbecue No. 2; various work papers of Duncan; Sharpe's work paper schedules reflecting consolidation of profit and loss for locations Nos. 2, 3, 4, and 5; bank reconciliations; and various invoices relating to the Circle 5 Ranch. Durham continued his examination of petitioners' records and tested for unreported income, which test indicated a possible understatement. Because of the potential understatement of taxable income, Durham suggested that Sharpe obtain a power of attorney from petitioners in order to discuss any items of adjustment. Sharpe then did her own test for unreported income and, after independently confirming Durham's findings, she contacted petitioner and urged him to consult legal counsel. At the insistence of Sharpe, petitioner retained legal counsel. The day after he informed Sharpe of the possible understatement, Durham returned to Sharpe's office where he was met by Sharpe and attorney William Tankersley, III, who had a power of *68 attorney authorizing him to represent petitioners for the taxable years 1976 and 1977. At that time, Durham was provided with a copy of petitioners' Federal individual income tax return for the taxable year 1977, which was to be filed shortly thereafter. During Durham's examination of petitioners' 1976 Federal individual income tax return, Sharpe was hired by Tankersley to determine whether petitioners' 1976 return had understated their taxable income for the year. She determined that petitioners potentially had income in the amount of $39,098.48 in 1976, which had not been reported as taxable income for their 1976 taxable year. Of that amount, Sharpe estimated that $21,469 was from unreported gross receipts of Hursey's Barbecue, Inc. for the period from October 1, 1976 through December 31, 1976. The $21,469 amount consisted of deposits to the bank account for Hursey's Barbecue No. 2, during the month of October 1976, in the total amount of $13,252.50, a deposit by petitioner to the bank account for the farm on December 1, 1976 in the amount of $2,991.50, and receipts from sales to parties in the amounts of $3,600, $425, and $1,200. Of the $13,252.50 deposited into the bank *69 account for Hursey's Barbecue No. 2 in October 1976, $9,565.28 was deposited on October 1, 1976. Sharpe treated the party receipts as unreported income because she could not find corporate or personal bank deposits to match them. Sharpe believed that the $21,469 amount was properly reported on petitioners' Federal individual income tax return for 1977 because Hursey's Barbecue, Inc. was an electing small business corporation with its first taxable period running from October 1, 1976 to May 31, 1977. Sharpe also determined that the income reported on the U.S. Small Business Corporation Income Tax Return, Form 1120-S, for Hursey's Barbecue, Inc. for its taxable period from October 1, 1976 to May 31, 1977, was understated by the amount of $36,366.06. During their first meeting, Durham and Tankersley discussed the potential understatement and Durham identified additional information that he needed, which Tankersley indicated he would attempt to provide. Several weeks later, Durham contacted Tankersley to obtain some additional information over the telephone and arranged to meet with Tankersley the next day. At the meeting, Durham secured a copy of petitioners' Federal individual *70 income tax return for 1975 and informed Tankersley that he intended to examine petitioners' 1975 return. Durham requested that he be provided with petitioners' 1975 books and records. Several weeks later, Tankersley called Durham and indicated that petitioners' 1975 books and records would be provided if they were assured that the information contained therein would be used only for civil purposes. Durham informed Tankersley that he could not give such an assurance. On July 13, 1978, following a meeting with his group manager, Durham referred the case to the Criminal Investigation Division. Criminal Investigation
Special Agent Peter M. Hutts was assigned by the Criminal Investigation Division to conduct a joint investigation with Durham of petitioners' 1974, 1975, and 1976 taxable years. Respondent's agents reconstructed petitioners' taxable income for the years in issue using the net worth and cash expenditures method. The income reconstruction determined substantial understatements of petitioners' taxable income for each year. On May 28, 1980, the Criminal Investigation Division recommended that criminal proceedings be instituted against petitioner for willful attempt *71 to evade income tax for the years 1974, 1975, and 1976, in violation of section 7201. The District Counsel's Office in Greensboro, North Carolina reviewed and approved the recommendation and referred it to the Department of Justice for prosecution on August 25, 1980. A grand jury was empaneled and heard witnesses testify on February 23 and 24, 1981. Subsequently, the Department of Justice declined to prosecute petitioner on the recommended charges. Petitioner was never indicted on these charges. OPINION Issue 1. Deficiency
The first issue for decision is whether petitioners had unreported income for their taxable years 1974, 1975, and 1976. Respondent redetermined petitioners' taxable income for the years 1974, 1975, and 1976, using the net worth income reconstruction method. This consisted of determining petitioners' taxable income on the basis of increases in petitioners' net worth during each of the years, with adjustments for any nontaxable items of income, plus increases for personal and other nondeductible expenditures, less deductions and certain other changes to arrive at adjusted gross income.This amount is adjusted for the standard deduction or itemized *72 deductions and exemptions. Using this method respondent determined that petitioners had understated their taxable income for each of the years in issue. With only two exceptions, the parties have stipulated or conceded all of the material facts required to correctly compute the taxable income of petitioners for the years in issue. The amounts of underreporting of taxable income now alleged by respondent and the amounts disputed by petitioners are as follows: Underreporting Alleged
Amount Disputed
Amount Not
Year
by Respondent
by Petitioner
In Dispute
1974
$64,277.19 $1,925.45
$62,351.74
1975
24,251.45
2,158.94
22,092.51
1976
31,128.07
23,790.60
7,337.47
The first disagreement the parties have with respect to the amount of unreported income involves the question of whether interest income earned on savings accounts in the names of petitioners' children should properly be included in petitioners' taxable income. [5] The second item in contention involves the question of whether petitioners' 1976 taxable income should include alleged dividends totalling $21,469 received from Hursey's Barbecue, Inc. in 1976. *73 (a) Savings Accounts
Petitioners contend that the savings accounts in the names of petitioners' children were either held in trust by petitioners for their children or were custodial accounts maintained for their children.Petitioners conclude that the interest on these accounts should not be included in their taxable income. [6] Respondent contends that petitioner has shown neither the intent to create a trust nor that a completed gift was made. Respondent further contends that petitioner's demonstrated control of the funds should dictate inclusion of the interest income in petitioners' taxable income. The eight savings accounts in issue consisted of seven savings accounts in a North Carolina savings and loan association and one in a North Carolina bank. The signature card for each of the accounts indicated the account holder to be "Charles S. Hursey, Trustee for" and listed the name of one of petitioners' children. Petitioner made neither *74 deposits to nor withdrawals from these accounts during the years in issue other than to shift money between accounts in the same child's name. These accounts were established in the standard form of so-called "Totten" or tentative trusts. See Matter of Totten,179 N.Y. 112, 71 N.E. 748 (1904). The most common construction of such an arrangment is that it entitles the named beneficiary to the balance of the account at the date of the depositor's death, but the depositor retains the power to withdraw and dispose of interest and principal during his life. Bogart, Trusts and Estates, sec. 47, p. 25 (2d ed. 1984). Further, the Supreme Court of North Carolina has stated that, "To make a gift of a bank deposit there must be not only an intention to give but a delivery and loss of dominion of the property given * * *. Hall v. Hall,235 N.C. 711, 71 S.E.2d 471, 473 (1952). The record demonstrates that petitioner did not relinquish dominion over the savings accounts in issue. Petitioner had the right to withdraw funds from the accounts, transfer money between *75 accounts, and to apply the funds for the benefit of his children to whom he had a support obligation. The record cannot be construed to find a transfer in trust or a completed gift. Petitioner retained complete dominion and control over the savings accounts. Therefore, the interest earned on the savings accounts must be included in petitioners' income in the years in which it was earned. (b) Alleged Dividends
The $21,469 amount in controversy is not an item actually in dispute as to its effect on the net worth of petitioners during 1976. Rather, in his notice of deficiency, respondent allowed this amount as a deduction against the underreporting otherwise determined by using the net worth income reconstruction method. Respondent allowed this because petitioners claimed to have reported the amount on their return for the year 1977. In his answer, however, respondent altered his position and disallowed this amount as a deduction against the underreporting, having concluded that the amount was properly reportable in 1976. To determine whether this amount is properly deductible from the underreporting determined by respondent, we must decide whether the amount should have *76 been reported in 1976 or 1977. Petitioners contend that the $21,469 amount in controversy in 1976 was properly reported in 1977. Petitioners allege that this amount was income of Hursey's Barbecue, Inc., an electing small business corporation, during the period October 1976 through December 1976, and should be treated as a dividend paid to petitioner on the last day of the corporation's taxable year, May 31, 1977. Respondent agrees that at least a portion of the amount was income of Hursey's Barbecue, Inc. during the period October 1976 through December 1976. Respondent contends, however, that such income of the corporation was received by petitioner, a cash basis taxpayer, in 1976 and should, therefore, be reported in 1976. Respondent further contends that any portion of the $21,469, which was not income of the corporation, is clearly income which should be reported in 1976 and, therefore, should not be deducted from the underreporting determined using the net worth income reconstruction method. Because the inclusion of this amount in petitioners' 1976 taxable income was raised in respondent's answer, *77 the burden of proof is on respondent. Rule 142(a). [7]
The $21,469 amount in issue consists of deposits to the bank account for Hursey's Barbecue No. 2 during the month of October 1976, in the total amount of $13,252.50, a deposit by petitioner to the bank account for the farm on December 1, 1976, in the amount of $2,991.50, and receipts from parties in the amounts of $3,600, $425, and $1,200. Of the $13,252.50 deposited to the bank account for Hursey's Barbecue No. 2 in October 1976, $9,565.28 was deposited on October 1, 1976. Sharpe treated the party receipts as unreported income because she could not find corporate or personal bank deposits to match them. In general, the income of an electing small business corporation is not subject to tax at the corporate level, but rather, is taxed to the shareholders of the corporation. Sections 1372, 1373. The timing of the shareholders' inclusion, however, may depend upon whether the income is distributed during the corporation's taxable *78 year in which it is earned. Income of an electing small business corporation, which remains undistributed as of the end of the taxable year in which it is earned, is taxed to its shareholders as though it were distributed to them on the last day of the corporation's taxable year. Section 1373(b); section 1.1373-1(a)(1), Income Tax Regs.Income actually distributed to a cash basis shareholder in the taxable year it is earned by the corporation, however, is to be taken into income by the shareholder in the taxable year of the shareholder in which it is received, pursuant to section 301. S. Rept. No. 1983, 85th Cong., 2d Sess. 219 (1958), 1958-3 C.B. 922; sections 1.1372-1(c)(2)(7), 1.1373-1(f), (g), Income Tax Regs.; Clark v. Commissioner,58 T.C. 94, 99 (1972). Petitioners are, therefore, correct to the extent that any portion of the $21,469 which was undistributed income of the corporation during 1976, should not be reported by petitioners until 1977. Such amounts should be treated as distributed to petitioners on the last day of *79 the corporation's taxable year, May 31, 1977.However, any portion of this amount, which was either distributed by the corporation in 1976, or was not income of the corporation, was properly includible in the income of petitioners in 1976. The amount of $2,991.50, which was deposited in the bank account for the farm on December 1, 1976, has been conceded by petitioners to be income of the corporation. Because petitioner held the bank account for the farm in his individual capacity, this amount must be treated as distributed to petitioner by the corporation on December 1, 1976, and is, therefore, includible in the income of petitioners in 1976. Similarly, it appears that petitioner received the party receipts in 1976 and used the amounts in his individual capacity. These amounts are, therefore, also to be treated as distributions by the corporation in 1976 and includible in petitioners' taxable income in 1976. Of the $13,252.50 deposited to the bank account of Hursey's Barbecue No. 2 during the month of October 1976, $9,565.28 was deposited on October 1, 1976, the day on which the corporation commenced operation of petitioner's barbecue restaurants. This amount is clearly not *80 income of the corporation and is, therefore, not deductible from the underreporting determined by respondent's income reconstruction. The treatment of the remaining $3,687.22, which was deposited in the account during October 1976, depends upon whether the checking account of Hursey's Barbecue No. 2 became an asset of the corporation on October 1, 1976. If the checking account was an asset of the corporation, then the income deposited in the account by the corporation has not been shown to have been distributed to petitioner by the corporation in 1976. Conversely, if the checking account remained an asset of petitioner in his individual capacity, amounts deposited therein are to be considered distributed to petitioner by the corporation on the date of deposit. We are unable to determine from the record whether the opening balance in the account for the month of October was part of the $10,736.59 indicated on their amended return for 1976 as petitioners' contribution of cash to the corporation. All of the payments out of this account, which we have been able to identify, appear to have been made to cover expenses of the corporation. The balance in the account dropped to near zero *81 at the end of October and the account remained virtually unused through the remainder of 1976. Based on the above, we find that respondent has failed to show that the $3,687.22 of deposits was distributed to petitioner by the corporation. Accordingly, we hold that of the $21,469 amount in controversy, $3,687.22 should be deducted from the underreporting determined by respondent in his net worth income reconstruction. [8]
Issue 2. Fraud
We now consider whether part of the *82 underpayment of tax required to be shown on petitioners' Federal income tax returns for their taxable years 1974, 1975, and 1976 was due to fraud with the intent to evade tax on the part of petitioner. Section 6653(b) imposes an addition to tax if any part of an underpayment of tax is due to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent must show that the taxpayer intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The elements to be established are (1) an underpayment of tax, [9] and (2) that some part of this underpayment was due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972). Petitioners have stipulated to the *83 existence of an underpayment for each of the years in issue. The determinative issue is, therefore, whether some part of the underpayment in each of the years in issue was due to fraud. The existence of fraud is a factual question to be determined by an examination of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. An examination of the entire record convincingly establishes that petitioner fraudulently *84 underreported his income during each of the years in issue. "Although mere understatement of income standing alone is not sufficient to prove fraud, the consistent and substantial understatement of income is, by itself, strong evidence of fraud." Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). [10] Petitioners underreported their income for the years 1974, 1975, and 1976 by the amounts of $64,277.19, $24,251.45, and $27,440.85, respectively. Further, in 1973, petitioners consented to the assessment of additional tax based on their having underreported their income by $19,656.72 for that year. The amounts of petitioners' unreported gross income and reported gross income for 1973, 1974, 1975, and 1976 are summarized as follows: Unreported Gross Income
Unreported
Reported
Total
as a Percent of
Year
Gross Income
Gross Income
Gross Income
Reported Gross Income
1973
$ 19,656.72
$ 7,901.00
$ 27,557.72
249%
1974
64,277.19
18,827.00
83,104.19
341%
1975
24,251.45
48,130.00
72,381.45
50%
1976
27,440.85
25,320.57
52,761.42
108%
Total
$135,626.21
$229,398.79
$235,804.78
135%
*85 The consistent understatement for the four consecutive years totals $135,626.21 and is clearly substantial when compared with the $100,178.57 of reported income for the period. The failure of petitioner to supply his bookkeeper with the data necessary for maintaining complete and accurate records is further evidence of fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. [11] While petitioners have attempted to place much of the blame for the underreporting of their income upon Ingram's bookkeeping and tax preparation service, it is clear from the record that the information provided Ingram by petitioner was inadequate to apprise Ingram of the full amount of petitioners' income. Petitioner consistently provided his bookkeepers with original records of expenses (i.e., invoices and cancelled *86 checks), while providing them with no original records of income (i.e., cash register tapes and wholesale tickets). It is also noteworthy that, as of the time of trial, petitioner had retained invoices and cancelled checks representing his expenses for Hursey's Barbecue No. 2, but claims to have inadvertantly disposed of all wholesale tickets and to never have maintained a tape in his cash register. Petitioners continue to assert that a tape was not maintained in the cash register even though, at trial, testimony was heard from petitioner's employees at Hursey's Barbecue No. 2 that a tape was maintained in the cash register during the years in issue. But even if a tape actually was not maintained in the cash register, as the Supreme Court stated in Spies v. United States,317 U.S. 492, 499 (1943), the intent to evade tax "may be inferred from conduct such as * * * destruction of books or records * * * [and the] handling of one's affairs to avoid making the records usual in transactions of the kind." Respondent has *87 stipulated that Ingram's service made certain errors in preparing the summary sheets upon which petitioners' 1974 and 1975 returns were based, but these errors are relatively minor in comparison to the amounts of underreporting in those years. [12] Petitioners have also tried to attribute fault to Ingram's service by claiming that Ingram did not question or attempt to verify the accuracy of the information provided. It may be that Ingram and petitioner's other bookkeepers should have raised more questions about the information provided them, but this does not excuse petitioner's failure to furnish them with adequate records. [13]
The evidence clearly shows that petitioner failed to inform his bookkeepers *88 of specific large items of income. During the years 1975 and 1976, petitioner failed to report, or only partially reported, income from the sale of barbecue, cole slaw, and brunswick stew to a distributor for the North Carolina State Fair. These sales totalled approximately $5,000 in each year and, at least for 1976, petitioner was paid the entire amount by a single check issued during the month of October. Petitioners failed to report any income from the rental of their tobacco allotment during each of the years in issue. During the year 1976, petitioner failed to report receipts from sales to parties in the amounts of $3,600, $425, and $1,200. In addition, petitioner admitted at trial that he did not always write up tickets for wholesale sales. Petitioner stated that he believed he was able to remember these sales at the end of the month when he added the wholesale sales onto the daily cash sales sheets. We find this very difficult to believe in light of petitioner's apparent inability to accurately record sales which he claims to have contemporaneously recorded. [14]
*89 Petitioners nonetheless allege that they were unaware that their income was being underreported during the years in issue. Petitioners assert that the underreporting was caused by a combination of the inadequacy of Ingram's bookkeeping system, a malfunctioning cash register, petitioner's exhaustion brought on by working long hours, and petitioner's dyslexia. As so often occurs in these cases, petitioners' reporting problems caused the consistent underreporting of income without significantly affecting the reporting of deductible amounts. See Otsuki v. Commissioner,53 T.C. 96, 110 (1969). We believe that during the years in issue, petitioners were aware that they were underreporting their income. During the year 1974, petitioners' bank account balances increased by $49,412.28, their business and leasehold equipment increased by $14,117, their farm equipment increased by $5,435, they decreased the amount of their farm mortgage by $7,500, and they paid off an automobile loan in the amount of $2,526.59, while incurring no additional liabilities. Petitioners' reported gross income for 1974, however, was only $18,827. During all of the years in issue, petitioner's *90 deposits to his bank account for Hursey's Barbecue No. 2 substantially exceeded his total reported sales. During these years, however, petitioner was using cash from the cash register to pay the restaurant's smaller bills. Petitioner admits that during these years he used cash from Hursey Barbecue No. 2 to pay personal expenses and deposited cash from Hursey Barbecue No. 2 in his personal bank accounts. It is difficult to believe that petitioner could have failed to notice that his deposits and business and personal use of cash from Hursey's Barbecue No. 2 so greatly exceeded the reported sales for Hursey's Barbecue No. 2 over a three year period. Further, petitioners' tax returns for all three of the years in issue were filed after petitioners had received the results of Jackson's audit of their 1973 taxable year. If it is at all possible that petitioners were not aware of their underreporting prior to this audit, the results of the audit should clearly have placed them on notice. Finally, extensive testimony was introduced dealing with petitioner's theory that his dyslexia disabled him from accurately reporting his income. After a careful review of the entire record, including *91 the expert testimony on this issue, we do not believe that petitioner's dyslexic condition was responsible for his failure to report more than $100,000 of income over a 3 year period. Petitioner did suffer from a mild form of dyslexia, impairing his ability to read but in no way reflecting on his innate intelligence or his abilities as a businessman. Petitioners have not explained how dyslexia could cause petitioner's failure to report individual large items of income. In addition, petitioner's dyslexic condition seems not to have impaired his ability to accurately identify and record deductible expenditures. While petitioner may have had some difficulty with reading and arithmetic, he was an intelligent capable individual who established and operated numerous businesses which earned substantial income. We cannot accept that petitioner was incapable of accurately reporting the income generated by a business he actively managed. The record clearly and convincingly demonstrates that petitioners were aware of the underreporting of their income and fraudulently attempted to evade their income tax. Accordingly, we hold that at least a portion of the underpayment for each of the *92 years in issue was due to fraud on the part of petitioner. Issue 3. Statute of Limitations
The final issue for our decision is whether the statute of limitations bars the assessment and collection of the deficiencies in petitioners' income tax for the taxable years 1974, 1975, and 1976. Section 6501(c)(1) provides that in the case of a false or fraudulent return with intent to evade tax, the tax may be assessed, or a proceeding in court for collection of the tax begun without assessment, at any time. Because we have held that petitioners fraudulently underreported their income for each of the years in issue, the statute of limitations does not bar the assessment and collection of the deficiencies. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
2. The parties have agreed to certain facts which affect respondent's net worth computations upon which the 1975 and 1976 deficiencies are based, and if we hold for respondent a Rule 155 computation will be necessary.↩
3. Dyslexia is defined as "a disturbance of the ability to read." Webster's Third New International Dictionary 712 (1971).↩
*. The figures for 1976 are for January through September, the period prior to incorporation. ** The 1975 figures for Hursey's Barbecue No. 3 are for the period from April through December. The restaurant opened in April of 1975. *** The 1976 figures for Hursey's Barbecue No. 5 are for the period from April through September. The restaurant opened in April of 1976.↩
4. On May 8, 1973, petitioners purchased a certificate of deposit in the amount of $100,000.↩
5. The actual issue involved herein is whether the savings accounts should be treated as assets of petitioners for purposes of respondent's net worth income reconstruction. In this case, however, the effect of so treating the savings accounts is merely to include the interest on the accounts in petitioners' taxable income.↩
6. While not entirely clear, it appears that petitioners have conceded on brief that the savings accounts did not satisfy the provisions of the North Carolina Uniform Gifts to Minors Act. N.C. Gen. Stat. sec. 33-69↩(a)(3) (1954).
7. Unless otherwise indicated, all rule references are to the Tax Court Rules of Practice and Procedure.↩
8. Petitioners have strongly urged that because they included the $21,469 in income for 1977, they should not be required to include any of the amount in 1976. Whether petitioners included this amount in income for 1977, however, is not relevant to our decision as to whether the amount should have been reported in 1976. Bank of Commerce v. Commissioner,10 B.T.A. 73, 76 (1928); H.A. Carey Co. v. Commissioner,29 T.C. 42, 47 (1957). If our holding does, in fact, because petitioners to pay tax on the same income in two taxable years, they must look to the mitigation provisions of the Internal Revenue Code, secs. 1311 et. seq.↩, for relief.
9. As relevant to this case, sec. 6653(c)(1) defines "underpayment" for purposes of sec. 6653↩ as a "deficiency" as defined in sec. 6211.
10. See also Adler v. Commissioner,422 F.2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Davis v. Commissioner,239 F.2d 187, 191 (7th Cir. 1956), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner,53 T.C. 96, 107-108↩ (1969).
11. See also Allen v. Commissioner,T.C. Memo. 1986-125; Scott v. Commissioner,T.C. Memo. 1986-102↩.
12. had the errors by Ingram's service, stipulated as having, occurred in 1974, been corrected, the amount of petitioners' underreporting would have increased↩ by $688.64. Had the error by Ingram's service, stipulated as having occurred in 1975, been corrected, the amount of petitioners' underreporting would have decreased by $1,056. Petitioners' underreporting for these two years totalled $88,528.64. 13. See Scott v. Commissioner,T.C. Memo. 1986-102↩.
14. Respondent contends that the cash sales sheets were actually completed by petitioner at the end of each month and that the figures recorded for daily retail sales were false and contrived. We note that there is substantial evidence in the record to support this conclusion. None of the employees who worked at Hursey's Barbecue No. 2 and testified at trial could recall having ever seen the cash sales sheets. All of the daily retail sales figures for any given month's sheets were in the same color ink or pencil, except for the months of January and February 1976, when two colors of ink were used. Respondent contends that this is an unlikely result if petitioner was recording these amounts on a daily basis as he claims. Roger Ingram, Jr. testified that when he came to pick up the records of Hursey's Barbecue No. 2, after the end of the month, the daily cash sales sheets were the records which were most often not ready. Also, retail sales figures were filled in and then scratched out for the days December 25 through December 28 of 1974, days on which the restaurant was closed for Christmas.While respondent makes a strong case, it is sufficient for us to conclude that the recorded figures were inaccurate and not essential to determine when petitioner entered the inaccuracies.↩