T.C. Memo. 1995-474


UNITED STATES TAX COURT


ADNAN AL KAISSY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20692-92.                    Filed October 3, 1995.


<u>Thomas M. Regan</u>, for petitioner.

<u>John C. Schmittdiel</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SCOTT, <u>Judge</u>: Respondent determined deficiencies in petitioner's income tax and additions to tax for the years and in the amounts as follows:

| | | Additions to tax | | |
|------|------------|----------------|-------------------|-------------------|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) |
| 1982 | $20,694 | -- | -- | -- |
| 1983 | 23,054 | -- | -- | -- |
| 1984 | 21,788 | -- | -- | -- |
| 1987 | 2,694 | -- | $135 | [1] |
| 1988 | 590 | $30 | -- | -- |
| 1989 | 542 | -- | -- | -- |

| Year | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661(a) |
|------|-----------------|-----------------|--------------|
| 1982 | $10,347 | [2] | $5,174 |
| 1983 | 11,527 | [3] | 5,764 |
| 1984 | 10,894 | [4] | 5,447 |
| 1987 | -- | -- | -- |
| 1988 | -- | -- | -- |
| 1989 | -- | -- | -- |

[1] 50 percent of the interest due on $2,694.
[2] 50 percent of the interest due on $16,124.
[3] 50 percent of the interest due on $18,722.
[4] 50 percent of the interest due on $14,437.

The only issue in controversy is whether any part of the underpayment of tax for the calendar years 1982, 1983, and 1984, was due to fraud with the intent to evade tax. Petitioner lists as a further issue whether the assessment and collection of a deficiency is barred by section 6501(a)[1] for the years 1982, 1983, and 1984. Respondent on brief concedes that absent a showing of fraud on the part of petitioner with respect to any one of these years, assessment and collection of any tax for that year is barred by the period of limitations, and petitioner recognizes that if fraud is shown the period of limitations has

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

- 3 -

not expired.  Respondent shows as an issue whether petitioner is liable for the addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a)(1) for each of the taxable years 1987 and 1988.  However, petitioner introduced no evidence with respect to the addition to tax for negligence for these years and has made no argument with respect to such an issue on brief.  We, therefore, assume that petitioner has conceded the addition to tax for negligence for each of the calendar years 1987 and 1988.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner, who resided in Minnetonka, Minnesota, at the time of the filing of his petition in this case, filed his Federal income tax return, Form 1040, for each of the calendar years 1982, 1983, 1984, 1987, 1988, and 1989.  Petitioner's returns for each of the years 1982, 1983, 1984, 1987, and 1988 were prepared by a public accountant, June Myslajek.  Each of these returns contained a Schedule C, Profit (or Loss) from Business or Profession, showing petitioner as a professional wrestler who operated under the name The Sheik.  On the returns for each of the years 1982, 1983, 1984, 1987, and 1988 petitioner claimed business expense deductions on Schedule C, including air fares.

Petitioner was born in Baghdad, Iraq. In 1956 petitioner came to the United States to attend the University of Houston, Texas, on an athletic scholarship. In 1957 petitioner transferred to Oklahoma State University of Agriculture and Applied Science on a wrestling scholarship. He remained at Oklahoma State University until the fall of 1960 when he transferred to Portland State College, Portland, Oregon. Other than one course taken at the University of Hawaii in 1961, petitioner completed his undergraduate education at Portland State College and received his B.S. degree in social science on June 10, 1962. In 1964 petitioner received his master's degree in education from the University of Oregon.

While in Portland, petitioner began wrestling professionally under the name Billy Whitewolf. Between 1964 and 1969 petitioner continued his professional wrestling in Portland, Oregon, and Hawaii. In 1969 petitioner returned home to Baghdad, Iraq. He returned to the United States in 1975 and began wrestling for the World Wrestling Federation. In 1981 petitioner moved to Minnesota to wrestle for the Minneapolis Boxing and Wrestling Club (MBWC) and affiliated clubs. At that time he began to wrestle under the name The Sheik. He continued to wrestle under the name The Sheik throughout the years here involved. During the years here in issue MBWC was owned and operated by Mr. Vern Gagne. The Salt Lake City Wrestling Club, Bay Area Allstar

Wrestling, Chicago Wrestling Club, Nevada Wrestling Club, Inc., and Phoenix Wrestling Club were affiliated with MBWC, and the group will hereinafter be referred to as the Gagne organizations. The Gagne organizations treated petitioner for income tax purposes as an independent contractor and shortly after yearend furnished him with Forms 1099 purporting to show the compensation paid to him during the taxable year. For the year 1982, the Forms 1099 furnished to petitioner showed that he received $58,369 from MBWC, and amounts ranging from $5,450 down to $2,550 from three of the affiliated clubs. In 1983 the Forms 1099 issued to petitioner showed that he received $41,815 from MBWC, $12,050 from the Chicago Wrestling Club, and amounts ranging from a high of $5,550 to a low of $3,650 from the three other affiliated wrestling clubs. For 1984 the Forms 1099 issued to petitioner showed that he received $48,044.88 from MBWC, and $11,660 from the Chicago Wrestling Club, and amounts ranging from a high of $3,425 to a low of $2,550 from the other three affiliated wrestling clubs.

During the years 1982, 1983, and 1984 petitioner also wrestled for the Winnipeg Wrestling Club (also known as AM-CAN), which was an additional member of the MBWC group. In 1983 AM-CAN issued a statement of fees, commissions, or other amounts paid to nonresidents of Canada to petitioner showing that AM-CAN had paid gross income to petitioner of $11,650 in that year. During the

years 1981 through 1989 petitioner frequently wrestled for MBWC or other Gagne organizations at matches which were far enough removed in distance from Minnetonka, Minnesota, that airplane travel was necessary. Generally, the Gagne organizations made the necessary air travel arrangements for petitioner and other wrestlers who were to appear at an event. In years prior to the year 1981, the Gagne organization did not arrange for or pay for the wrestlers' air travel. The wrestlers arranged for and paid for their own air travel. Occasionally, wrestlers would not arrive at the place where the wrestling event was to be held a full hour ahead of the scheduled opening of the event. Mr. Vern Gagne was not pleased with the time of arrival of some of the wrestlers and announced to a group of them in their dressing rooms at one event prior to 1981 that MBWC was going to begin arranging for the wrestlers' air travel, either by commercial airlines or by chartered plane, and that MBWC would purchase the tickets and see that the wrestlers were furnished with the ticket to travel to the event. At this time he stated that the cost of the airplane tickets was going to be deducted from the gross receipts for the performance before a division of those receipts was made between the part the wrestlers would get and the part the club would get, and, therefore, in effect the wrestlers would still be paying a part of the cost of their air fare. The amount wrestlers as a group received from an event in which they

participated was determined by subtracting from the portion of the gross proceeds of the event allocated to the club, the wrestlers' television expenses, taxes, and air fare, where travel was by air, and dividing the remainder between the wrestlers and the club on a 30-70 or 35-65 percent basis.  Before the club began obtaining the air transportation for the wrestlers, only television costs and taxes were deducted from the gross proceeds before the split.  The 30 to 35 percent of the club's adjusted gross proceeds from a show allocated to the wrestlers would be divided among the wrestlers performing at a certain event on a basis determined by the club, which was primarily geared to the view of the managers of the club as to which wrestlers had been most instrumental in attracting the crowds that came to the wrestling matches.

Mr. Vern Gagne considered the deducting of the air transportation costs from the gross take before splitting it between the wrestlers and the club to be a fair arrangement, whereby the wrestlers and the club each paid a proportion of the air fare costs.

From time to time, the wrestlers would discuss in the locker rooms the fact that they were really paying for their own air travel, since it "came off the top", so that the checks they received from each wrestling event were less than they had been

before the Gagne organizations began arranging for the air travel.

The Gagne organizations often arranged air travel for the wrestlers through a travel agency known as Adventure Travel, Inc. Mary Ellen Marxen (Mrs. Marxen), who was the office manager of MBWC during the years here in issue, generally made the arrangements for the wrestlers' travel. She would contact a representative of Adventure Travel, Inc., to advise him of the wrestling dates, the number of wrestlers who would be traveling, and the names of the travelers. The travel agency would then make the necessary arrangements and obtain commercial air travel tickets for the wrestlers. When petitioner and other wrestlers were to travel by regular scheduled commercial flight, the airline tickets would be delivered to the Minneapolis office of MBWC prior to the scheduled match, and either the wrestlers would come and pick the tickets up at the Minneapolis office of MBWC, or on some occasions the tickets would be mailed or otherwise delivered to the wrestlers by a representative of MBWC. The bill for the wrestlers' air travel expenses where air travel was arranged by the Gagne organizations was sent directly to and paid by MBWC or another Gagne organization. The bills submitted to MBWC by Adventure Travel, Inc., identified each wrestler by name, or show name, and listed the ticket price associated with the trip. When petitioner traveled by chartered plane, as he and

other wrestlers did on some occasions during the years here in issue, the invoices for the cost of the chartered travel would be submitted by the charter company directly to MBWC, and MBWC arranged for and paid the cost of the chartered flights to transport the wrestlers to the matches it had arranged.  Shortly after the match had taken place, MBWC would receive a final accounting of the receipts and expenses for each performance at the hosting area and the percentage of the gross take that went to MBWC.  Mrs. Marxen would prepare the draft and final show sheets for MBWC.  After the final accounting, Mrs. Marxen would supply the information as to the receipts, minus certain expenses which included the transportation expenses by commercial airline or chartered plane where such expenses were paid by MBWC, to Mr. Vern Gagne or his co-promoter Mr. Wally Carbo, who would then determine the payout to each wrestler.  First the percentage of the receipts minus certain expenses, including transportation expenses, to be paid to all the wrestlers in the particular show was determined, and then the percentage of that determined by Mr. Vern Gagne and Mr. Wally Carbo to be allocated to each wrestler was determined based on their evaluation of the wrestler's contribution to the production of the receipts.  After Mr. Vern Gagne or Mr. Wally Carbo determined the amount to be paid to each wrestler who participated in an event, Mrs. Marxen would prepare payment checks to the wrestlers.  Sometimes a particular check

would include payment for more than one match.  If a wrestler had requested an advance and it had been given, the advance would be deducted from his portion of the payoff.

The wrestlers who worked with MBWC were responsible for arranging and paying for their own lodging, meals, and local transportation expenses associated with out-of-town performances. On some occasions, a wrestler working with MBWC would make his own arrangements for regular commercial travel and pay for his own ticket.  MBWC would usually reimburse the wrestler for commercial air travel for which the wrestler had paid.  Such reimbursements were included in the paychecks received by the wrestlers, and would be noted on an adding machine tape which was attached to the check, which would show also repayment of advances or other items.

During the years 1981 through 1983, petitioner kept a ledger in which he would record his expenses, whether the expenses were or were not, in his opinion, deductible.  During 1981 through 1983 Mrs. Lisa Baird (Mrs. Baird) did the detailed work of keeping petitioner's ledger books.  Mrs. Baird was living with petitioner during 1981 through 1983.  Petitioner would give information to Mrs. Baird, and she would enter the information on the ledger book record.  The records would show cost of travel, meals, and other expenses.  Petitioner would give Mrs. Baird receipts, copies of airline tickets, and other information

regarding his expenses on trips, and Mrs. Baird would merely record the information as given to her in the ledger.  During the period 1984 through 1987 the ledgers were kept in the same way by petitioner's then wife, now Mrs. Beth Andrew McDaniel. Petitioner followed the same system of giving information to his then wife, which she entered in the ledger book record, as he had followed with Mrs. Baird.

Prior to moving to Minnesota in 1981, petitioner had H & R Block prepare his Federal income tax returns.  He had never prepared his own Federal income tax returns.  Some of the other wrestlers referred petitioner to Mrs. June Myslajek (Mrs. Myslajek), saying that she did the returns of some other wrestlers.  Petitioner believed that Mrs. Myslajek had the experience necessary to make out a proper Federal income tax return for him.  When petitioner met with Mrs. Myslajek prior to the due date of his 1981 return, he handed her the ledger book record that Mrs. Baird had prepared under his supervision.  He told Mrs. Myslajek that she could contact the Gagne organization if she had any questions about his return.  Mrs. Myslajek told petitioner that she prepared returns for many wrestlers and knew how to prepare returns for wrestlers.  Petitioner sat with Mrs. Myslajek while she prepared his return, and when it was completed, he signed and filed the return.  This same method of

preparation of his return was followed throughout each of the other years when Mrs. Myslajek prepared his return.

Mrs. Myslajek in her testimony at the trial insisted that petitioner's records were right since all wrestlers paid their own air fare. She stated that if the company had paid the air fare and had not been reimbursed by the wrestlers, the company should have shown it on the Forms W-2 issued to the wrestlers, or at least on the Forms 1099. She stated that it never occurred to her to question that petitioner had paid the air fare or if it had been paid by the club, that it had been included in the amount reported on the Forms 1099, since she knew from making out returns for wrestlers, including her brother-in-law, that the club did not pay transportation expenses for wrestlers. She stated she knew that wrestlers paid all of their own transportation expenses. She stated that she had no reason to call the offices of MBWC, since she believed that either petitioner had paid the air fare expenses, or if the company had paid any of them, the amount was included as a payment made on behalf of petitioner on the Forms 1099.

Among the records petitioner furnished to Mrs. Myslajek were the Forms 1099, which were given to him by MBWC and its affiliates. These Forms 1099 did not include the amount of air fare paid for airline tickets furnished to petitioner. It was

from the Forms 1099 that Mrs. Myslajek obtained the receipts of petitioner from his profession of wrestling.

When the special agents of the Internal Revenue Service came to petitioner's home to speak to him about his income tax returns for the years here in issue, they asked to see various documents, including receipts. Petitioner volunteered to them the fact that he had kept ledger book records and voluntarily produced those ledger books to the special agents. The special agents took the ledgers, with petitioner's permission, copied them, and returned them to petitioner.

In the years 1981 through 1984 petitioner claimed deductions for air fare in the amounts of $20,359, $32,050, $38,465, and $29,086, respectively. All air fares of petitioner in 1981 and 1983 had been paid entirely under the system described by MBWC, and for 1982 and 1984 petitioner had otherwise paid only $659 and $179.88, respectively, in air fares. In 1985 petitioner claimed a deduction for air fare expenses in the amount of $18,160, all of which was for airline tickets furnished to him by MBWC under the system hereinbefore described.

On January 29, 1990, petitioner was charged with three counts of violating section 7206(1) for filing false income tax returns for each of the taxable years 1982, 1983, and 1984, based on his claim of substantial air travel expense deductions for those years to which he was not entitled, thereby understating

his adjusted gross income and his tax liability.  Subsequently, petitioner pled guilty to the charge of violating section 7206(1) for the year 1983 by knowingly filing a false income tax return that "stated his air travel expenses were $38,465, * * * his adjusted gross income was $17,503, whereas as he then and there well knew and believed, he had no air travel expenses and his adjusted gross income was $55,838, resulting in additional tax due and owing of $14,050."  Petitioner, through his attorney and the representative of the U.S. attorney handling the case, entered into a plea bargain agreement.  When the case was called and the court was informed of the plea bargain agreement, petitioner stated that he had discussed his case with his lawyer and wanted to enter the guilty plea to the year 1983 under the plea bargain agreement.  Petitioner, at the hearing, stated that he had made a mistake, but when informed by the U.S. attorney and the judge that it was necessary that he say that he had claimed the deductions for air fare that he had not paid knowing that he was not entitled to claim the deductions, he so stated. Petitioner was permitted to continue to travel out of State to wrestling matches between the time he entered the guilty plea and the date of sentencing.  The judgment and probation/commitment order of the U.S. District Court was entered on May 4, 1990.  It provided that:  "Imposition of sentence is suspended and the

defendant is placed on probation for THREE (3) years", fined $5,000, and required to perform 100 hours of community service.

The major adjustment made by respondent in the notice of deficiency for the years 1982 through 1984 was to disallow the air fare deductions claimed by petitioner and to assert the addition to tax for fraud. Certain other minor adjustments were also made by respondent, not involving fraud, and other additions to tax as set forth above were asserted.

## OPINION

The only controversy in this case concerns whether any part of petitioner's understatement of his income tax for the years 1982, 1983, and 1984 was due to fraud with intent to evade tax. If fraud is established, petitioner does not question respondent's computation. Absent fraud, petitioner claims that the period for assessment and collection of tax had expired before the time of the issuance of the notice of deficiency and, therefore, assessment and collection of any deficiency are barred. Respondent does not question that, absent fraud, assessment and collection of any deficiency for 1982, 1983, or 1984 are barred.

Section 6653(b)(1) provides for an addition to tax of 50 percent of the underpayment if any part of any underpayment is due to fraud. Section 6653(b)(2) provides for a further addition of 50 percent of the interest due under section 6601 upon that

portion of an underpayment of tax by a taxpayer which is specifically attributable to fraud.

The burden is on respondent to establish fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Whether a portion of the tax is due to fraud is a question of fact to be determined from consideration of the entire record before the Court. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Seldom is the Commissioner able to produce direct evidence of a taxpayer's fraud, since fraud by its very nature is a question of a taxpayer's intent. However, the Commissioner may prove fraudulent intent through circumstantial evidence. A taxpayer's entire course of conduct may be considered in determining whether fraudulent intent exists. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The often-cited case of Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, lists as some of the "badges of fraud": (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failure to cooperate with tax authorities. Although the factors listed in the Bradford case are always considered, the record as a whole must be reviewed by the Court in determining whether the Commissioner has shown fraud by clear and convincing evidence. The only item listed in the

Bradford case as indicating fraud which is present in the instant case is the understatement of income. Here, the understatement of income results from petitioner's taking an improper deduction. All petitioner's receipts of income were reported in his gross income on his returns for each of the years here in issue. Respondent makes some arguments that certain items reported by petitioner were reported in an improper manner, but does not have any fraud contention based on underreporting of receipts by petitioner. Respondent questions the type of the records petitioner kept. Petitioner's records were incorrect in that they had shown airline tickets purchased by MBWC as part of his expense, but otherwise were reasonably good records for an individual to keep. The controlling question here is whether respondent has shown by clear and convincing evidence that petitioner claimed the deductions for air fares on his tax returns knowing that he was not entitled to claim the deductions, and intending by claiming those deductions to evade a tax he knew to be owing. From the evidence as a whole, we conclude that respondent has failed to show that petitioner was aware that he was not entitled to claim the air fare deductions, and has failed to show any intent by petitioner to evade tax by claiming these deductions.

Petitioner took all his records to a return preparer for preparation of his return. This return preparer did not question

how the air fare was paid and did not check with petitioner's "employer" or discuss with petitioner the expenses he was entitled to deduct. She stated in her testimony at trial that she had no conversation with petitioner when she was preparing his return with respect to whether he was entitled to deduct expenses for airline tickets. She stated that she did not have such a discussion, because--

> these wrestlers were not getting reimbursed all those years. They were not getting reimbursed according to what I know. They were not getting reimbursed. * * * these wrestlers always paid their own expenses * * * it never occurred to me to ask him that [whether the cost of the airline tickets had been included on the Forms 1099 furnished him by MBWC]. * * * if a salesman came to me * * * I would ask him. They are different than wrestlers are, but I would ask a wrestler too, but they never did get reimbursed.

When this testimony of petitioner's return preparer is considered in the light of the rest of the evidence in this record, it is reasonable to infer that petitioner considered that his return preparer had approved the way in which he was handling his deductions for air fare on his return.

The record shows that in an economic sense a portion of the airline fares was paid by the wrestlers. The amount a wrestler got from a show was computed by taking a certain percent (usually 30 to 35 percent) of the gross amount received by the club for putting the show on, after deductions of television costs, taxes, and the transportation of wrestlers, where that was paid, and

prorating it among the wrestlers. As the owner of MBWC testified, this split the cost of airline transportation between the club and the wrestlers. When the wrestlers had paid for their own transportation, there was no deduction from gross receipts for transportation prior to the split between the club and the wrestlers. Therefore, the wrestlers each received more from the receipts of the show than they did after the club paid the airline ticket costs or chartered plane costs and deducted it, as the wrestlers say, "off the top" of the take before its division between the wrestlers and the club. In the economic sense, the wrestlers paid a part of their own airline transportation by receiving less for wrestling at performances when they went by airplane than they would have received had the club not furnished them with the airline tickets. Petitioner's return preparer was convinced that if the club had paid out the amount for the airline tickets as the club manager testified, the amount should have been shown on the Forms 1099 furnished to the wrestlers as part of payment in money or in kind to the wrestlers for the year. Whether or not she is correct in her conclusion that the amount paid by MBWC for air fare should have been included on the Forms 1099, there is certainly much to be said for her position that it should have been. Many people do not understand the concept that a deduction cannot generally be taken for something where an equivalent amount has not been included in

income under circumstances such as those here present. Had the Forms 1099 reported the payments by the MBWC for airline tickets, a deduction for the amount of the cost of the tickets which were used for a business purpose of being transported to the shows might have been proper for each wrestler. The record as a whole shows that many, if not most, of the wrestlers considered that they were paying for the airline tickets, since the cost of the tickets was deducted from the gross receipts from the show before the proration of their percentage of the gross receipts among the various wrestlers who performed at the show. The record shows that from time to time this fact was discussed by the wrestlers in their locker rooms or during their trips. Under these facts, it appears plausible that petitioner could have considered that he paid for the airline tickets that were furnished him by MBWC and was, therefore, entitled to deduct the cost of the tickets as an expense. While persons accustomed to tax law understand the concept that an item paid for a person but not included in that person's income is not deductible, it is not uncommon for people not familiar with tax law to fail to understand this concept. This factor, combined with the confidence petitioner placed in his return preparer, and her certainty that wrestlers paid their own expenses, which must in some way have been intimated to petitioner during the preparation of his return, negates fraud by petitioner in claiming the deductions for air fares.

Much of this record supports a basis for petitioner to believe that he had paid for the airline tickets. Respondent argues that petitioner's return preparer contradicted petitioner's statement that when he first came to her, he told her that she could contact the Gagne organization if she had any questions. The portion of the transcript respondent cites for this contention does not support respondent's argument. When the return preparer was asked whether she remembered what the taxpayer said to her when he gave her the expense logs, her answer was no. And she was then asked: "Do you remember what he said when he asked you to prepare his return?" The answer was: "No; it was nothing special, he just probably said good morning, or good afternoon." The other citation given by respondent was the answer to the question "Do you remember him asking you to verify any of the information that was set out in these logs?" The answer was, "Asking me to verify it, no". When the Court asked the return preparer to be more precise, she said: "Did he ask me to verify it. What do you mean by that question?" Instead of explaining, respondent's attorney asked whether when petitioner presented information to her, he asked her to determine whether it was correct or not. She answered: "No, he didn't". This testimony does not support respondent's contention that petitioner did not inform the return preparer that the Gagne organization could be called if she had questions.

Petitioner voluntarily furnished his logs to the special agents. The fact that these logs were voluntarily furnished is an indication not only of cooperation by petitioner, but also an indication that petitioner did not know that the logs were not accurate. Respondent argues that petitioner may have believed the notebook logs would satisfy the special agents of the accuracy of his return, even though he knew the return to be false and, therefore, that petitioner produced the logs and permitted the special agents to photocopy them, but he must have realized his mistake in doing this when he asked the following day for their return. It is difficult to follow this argument, since petitioner was aware when he asked for the return of the logs that they had been copied by the special agents. Returning the logs would in no way take away the information furnished to the special agents.

Respondent argues that at times petitioner stated that he prepared the logs, and at other times that they were prepared by Ms. Baird, and later prepared by his ex-wife. The Court sees nothing misleading about these statements, since the record is clear that petitioner furnished the information and, where needed, assisted in how it went into the logs, and the actual writing was done by Ms. Baird, and his ex-wife. He even explained why the two women did the actual writing by saying their handwriting was better than his.

Respondent contends that even if petitioner's return preparer was negligent in the way she handled the preparation of his return, this fact does not excuse petitioner's willfulness to deceive. However, the question is whether respondent has shown by clear and convincing evidence that petitioner was attempting fraudulently to deceive in order to evade tax. The fact that he would be led by a return preparer to believe that he had done all that he had needed to do and his returns would be accurately prepared, goes to the question of his intent to evade tax. In our view, the only evidence respondent has produced in this case that the claiming of these deductions was other than a mistaken belief that the amounts were deductible is the statements petitioner made when he pled guilty to count 2 of the indictment alleging that he had filed a false return for 1983 by deducting the cost of air transportation that he knew he was not entitled to deduct. Respondent points out that at the hearing on petitioner's guilty plea, the court asked petitioner: "Well, the point is, did you know you were cheating when you had some $38,000 in air expenses", and petitioner answered, "Yes, your honor". The court asked, "You knew that", and petitioner answered, "Yes". The court stated: "So you did something wrong and you appreciate that". Petitioner answered: "Yes your honor, I did something wrong, you are right." The Court then asked: "No question about it, huh?" And the answer was, "Yeah". This

followed statements made by petitioner that he had made a mistake in the way he handled the airline fares and the court's pointing out to him that he must not only plead guilty, but must state that he understood what he was doing, had consulted his attorney, and understood the charges against him, and he must answer questions that showed he understood that he was guilty. The transcript of the guilty plea as a whole is not clear that petitioner testified that at the time of the filing of his return he knew that it was wrong to claim the deductions for airline expenses. This is really the issue, not whether later petitioner learned, and now knows, that the claiming of these expenses was wrong. Although the person representing the U.S. attorney's office and the court made it clear to petitioner that he would have to admit knowing that the claiming of these expenses was wrong, and he did admit that, never does it appear clearly that he departs from his statement of making a mistake and intends to be saying that he knew at the time he filed his returns that what he did was wrong. There is, of course, by pleading guilty, the inherent admission that he violated the provisions of section 7206(1), which provides that any person who willfully makes and subscribes any return which contains or is verified by declaration that it is made under penalty of perjury, and "which he does not believe to be true and correct as to every material matter" is guilty of a felony. However, the conviction under

this section does not establish that a portion of the underpayment by petitioner in the year involved is due to fraud with intent to evade tax under section 6653(b).  Wright v. Commissioner, 84 T.C. 636 (1985).  As we stated in the Wright case 84 T.C. at 643-644, a conviction for willful falsification, under section 7206(1), while not dispositive, will be one of the facts to be considered in a trial on the merits of a case.  However, there remained in Wright a genuine issue of material fact as to whether the reason for the underpayments was an attempt to evade taxes.  We stated that the issue of intent, adequately raised by the taxpayer in that case, was clearly one requiring a trial on the merits.

Here, we have considered petitioner's conviction on a plea of guilty to a violation of section 7206(1) with respect to his 1983 return, but have concluded that this evidence alone is not sufficient to be clear and convincing that a part of the underpayment of tax for 1983 was due to fraud with intent to evade tax.

While petitioner attended college for some years, and even ultimately received a master's degree in education, he primarily was an athlete during his college years, and did not have courses that would qualify him to have a complete understanding of business and tax matters.  His business associates were other wrestlers.  The wrestlers understood that from an economic

standpoint, at least partially, they were paying for their airline tickets, but there is nothing to indicate that they understood because of the nature or the manner in which payment was made for those tickets, or from the fact, if they knew, that the value of the tickets was not included on the Forms 1099 furnished to them, that they were not entitled to claim a deduction for the airline tickets. Certainly, there is no clear and convincing evidence to the effect that petitioner did understand this fact. We hold that respondent has failed to show by clear and convincing evidence that any part of the underpayment of tax for any of the years 1982, 1983, or 1984 was due to fraud with intent to evade tax.

Since there are years involved other than the years 1982 through 1984,

<u>Decision will be entered</u>

<u>under Rule 155</u>.